STEIN *v.* NEW YORK.

NO. 391.

Argued December 18, 1952.—Decided June 15, 1953.

158

*John J. Duff, J. Bertram Wegman* and *Peter L. F. Sab-batino* argued the causes for petitioners. With *Mr. Duff* on the brief for petitioner in No. 391 was *Philip J.*

*O'Brien.* With *Mr. Wegman* on the brief for petitioner in No. 392 were *I. Maurice Wormser* and *Richard J. Burke.* With *Mr. Sabbatino* on the brief for petitioner in No. 393 was *Thomas J. Todarelli.*

*John J. O'Brien* and *John C. Marbach* argued the cause for respondent. With them on the brief was *Burton C. Meighan.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

Petitioners were found guilty of felony murder[1] by a jury in Westchester County, New York, and sentenced to death. The New York Court of Appeals affirmed without opinion.[2] We granted certiorari, because of questions raised by use of two confessions.[3]

The trial lasted over seven weeks and the record runs to more than 3,000 pages. Evidence proffered and heard, subject to rejection or acceptance in the judgment of the jury, included two written confessions by petitioners Cooper and Stein, together with testimony as to their incidental oral confessions and admissions. Each written confession implicated all three defendants and all objected to introduction of each confession on the ground that it was coerced. Wissner further moved as to each that, if Cooper's and Stein's confessions were admitted, all reference to him be stricken from them. The trial court heard evidence in the presence of the jury as to the issue of coercion and left determination of the question

---

[1] A homicide committed by a person engaged in the commission of a felony. It is first-degree murder and carries a mandatory death sentence unless the jury recommends life imprisonment. New York Penal Law, §§ 1044 (2), 1045, 1045–a. No such recommendation was made here.

[2] *People* v. *Cooper,* 303 N. Y. 856, 104 N. E. 2d 917.

[3] 344 U. S. 815.

to the jury. Petitioners claim that such use of these confessions creates a constitutional infirmity which requires this Court to set aside the conviction.

## I. Facts About the Crime.

The main office of Reader's Digest is thirty-one miles from New York City, in the relatively rural area of northern Westchester County, near the town of Pleasantville. From this secluded headquarters a truck several times each day makes a run to and from town. On April 3, 1950, William Waterbury was driver of the 2:50 p. m. trip into Pleasantville. He picked up Andrew Petrini, a fellow employee, and various bags containing mail, about $5,000 in cash, and about $35,000 in checks, and started down the lonely country roads to town. Neither was armed. After a few hundred yards, Waterbury was cut off and halted by another truck that had been meandering slowly in front of him. He observed a man wearing a false nose and eyeglasses and with a revolver in his hand running toward him. After an unsuccessful attempt to open the door, the assailant fired one shot into Petrini's head. Waterbury was then ordered into the back of the truck where another man tied him up. His captors took the bag containing the money and checks and abandoned the truck on a side road with Waterbury bound and gagged therein. A few minutes later he was released by a passer-by and had Petrini hurried to the hospital where he died shortly from the effects of a .38 revolver bullet lodged in his skull.

Near the scene of the crime police found the abandoned truck used by the killers to block the way of Waterbury. It was learned to be the property of Spring Auto Rental Co., on New York's lower East Side and at the time of the murder to have been out on hire to a man who had rented the same truck on three prior occasions and who each time had identified himself by producing

New York driver's license No. 1434549, issued to W. W. Comins, of 228 West 47th Street, New York City. The address turned out to be a hotel and the name fictitious. However, the police managed to establish that the license had been procured by one William Cooper.

It is more than a figure of speech to say that William Cooper had an ironclad alibi: at the time of this crime he was serving a sentence in a federal penitentiary. Suspicion attached to members of his family. Nearly two months ran on with no solution of the crime, however, until toward the end of May or the beginning of June, when police learned that William's brother, petitioner Calman Cooper, had served a sentence in federal prison where he was a "working partner" and chess-playing buddy of one Brassett, who was serving time for having rifled mails addressed to the Reader's Digest while working in Pleasantville. It appeared that during their prison association Brassett had told Calman Cooper of the opportunity awaiting at Reader's Digest for an enterprising and clever robber.

On June 5, 1950, police arranged for Arthur Jeppeson, who had rented the Spring truck to "W. W. Comins," to be on a street in New York City where they expected Calman Cooper to pass. Jeppeson testified on the trial that Cooper recognized him and said to him that "this truck that he rented from me was in a killing upstate and he had nothing to do with it . . . ." Jeppeson testified that he then asked Cooper two questions: "Why the hell didn't you report it to the police?" and ". . . why did he give me that license . . . ."? Cooper's reply was stated to be, "That is the license they give him to give me." Jeppeson further testified that Cooper had inquired if the officers had shown him any pictures and asked him not to identify Cooper to the police.

At the end of this conversation, on Jeppeson's signal, two policemen closed in and arrested Cooper. That

night (2 a. m., June 6) petitioner Stein was arrested. On June 7, about 9 a. m., petitioner Wissner was arrested. The three petitioners were arraigned and charged with murder on the evening of June 8. A fourth suspect, Dorfman, was sought but remained at large until he voluntarily surrendered on June 19, 1950.

All four were indicted for murder. When the time came for trial, the case against Dorfman, who turned state's evidence, was severed. A motion for separate trial by petitioner Wissner was denied, and trial proceeded against the three remaining defendants.

Other than two alibi witnesses offered by Wissner and a halfhearted attempt by Cooper to establish insanity, the defense consisted almost entirely of attempts to break down the prosecution's case. None of the defendants testified.

The confessions constituted only a part of the evidence submitted to the jury. We can learn the context in which the confessions were obtained by the police and received in evidence only from a summary of the whole testimony.

Waterbury, who was in the truck with the murdered Petrini, identified Wissner as the man who fired the shot and Stein as the man who tied him up.[4] He testified that on the 8th of June the police brought him to Hawthorne Barracks and that, upon entering a room in which Stein was present, defendant Stein pointed out Waterbury as the driver of the truck.[5] On cross-examination,

---

[4] The defense argued that Waterbury's recollection was inaccurate and that he had only 25% vision in one eye.

[5] The defense says that this constitutes a coerced confession— Stein having made the statement in police custody. It was not a confession of guilt but an admission of a specific fact. Although New York may impose the same requirements for admissibility on an admission as it does on a confession, see *People* v. *Reilly*, 181 App. Div. 522, 528, 169 N. Y. S. 119, 123, aff'd, 224 N. Y. 90, 120 N. E. 113,

he recounted that he had picked Wissner out of a lineup at Hawthorne Barracks on June 8 and identified him as the killer.[6]

Jeppeson testified that the rental truck had been let to Cooper on April 3 and on three previous occasions, Cooper having in each case used an alias and a false license as before stated, and having given his occupation as "bookseller." He also testified as to his conversation with Cooper on the morning of the latter's arrest.

Dorfman, in substance, testified that he and Wissner were partners in an auto rental business on the lower East Side of New York City. Cooper and Stein had approached them about six weeks before April 3 with the suggestion that they collaborate on a robbery at the Reader's Digest. The truck used in the killing had been rented by Cooper on April 3 and on three previous occasions when the conspirators had driven to Pleasantville to "case" the area and determine whether conditions were favorable for success in the crime. At these times, and one other, they also brought to Pleasantville an auto

such utterances are not usually subject to the same restrictions on admissibility as are confessions. See 3 Wigmore on Evidence (3d ed.) § 821 (3). In the face of the weight of authority to the contrary, it cannot be said that any such requirement is imposed by the Fourteenth Amendment. Even if this admission were subject to the same reliability tests as confessions, there is no evidence that Stein was under any coercion thirty hours after his confession of June 7.

[6] The defense points out that: Waterbury went through the lineup two or three times before identifying Wissner; the lineup consisted of Wissner and several state troopers, each of whom was several inches taller than Wissner; two ladies who had seen a man who might have been the killer lurking in the vicinity of the Reader's Digest on April 3 also went through the lineup, and each of them identified as that man one of the state troopers in the lineup who was in Long Island on the day of the murder. The facts show that the lineup was not so constructed as to suggest Wissner as the man to be identified.

owned by the Dorfman-Wissner agency. On April 3, the four set out for Pleasantville with the truck, the car, and a tan valise containing three guns owned by Wissner. They left the car about a mile from the Reader's Digest and all got in the rented truck. The guns were distributed, Dorfman getting a black automatic and Wissner a nickel-plated revolver. The holdup proceeded in the manner described by Waterbury. Dorfman heard a shot during the holdup, but did not see who fired it. On the way back, however, Wissner expressed regret at the necessity of shooting the guard. The defendants threw away their guns, left the Reader's Digest truck, with Waterbury tied up inside, on a side road and left the rental truck at the place where the car had been parked during the commission of the crime. They drove back toward New York in the car. When they got to the Bronx, they parked the car and went on by subway and taxicab to Dorfman's apartment in Brooklyn, where they divided up the proceeds and separated. Subsequently, Dorfman and one Homishak went up to the Bronx and picked up the car.

Under New York law, Dorfman's testimony, since he was an accomplice, required corroboration.[7] It was afforded in the following ways: (1) Mrs. Dorfman testified that Cooper, Stein and Wissner had come to her apartment with her husband on the evening of April 3 and that they carried with them the tan valise which Dorfman had identified as that used in the robbery. It was established by police testimony that this valise had been found in June in Dorfman's apartment and when searched was found to contain a fragment of paper from an order form used by the Reader's Digest in April of

---

[7] N. Y. Code Crim. Proc., § 399. *People* v. *Goldstein*, 285 N. Y. 376, 34 N. E. 2d 362.

1950—an order form to which subscribers frequently attached cash in such manner that on removal of the cash a portion of the order form would come with it. (2) Police testified that Dorfman's automatic was found near the area where he said that he had thrown it away on April 3. (3) It was established that Petrini was killed by a bullet from a .38 revolver. (4) Homishak testified that he saw Dorfman in the company of the three petitioners on April 3 [8] and that he accompanied Dorfman to the Bronx to pick up the car that night. (5) An employee of the Reader's Digest at Pleasantville testified that he had seen the Spring Rental truck on the premises on April 3 and on one prior occasion. (6) Jeppeson's testimony substantiated Dorfman's story about rental of the truck.[9] (7) It was established that Cooper had absented himself from his job on April 3. (8) Waterbury's testimony about the events of April 3 and identification of Stein and Wissner checked with Dorfman's story. (9) The two confessions, if accepted by the jury, also were corroborative of the accomplice Dorfman in many details.

The defendants made no attempt to contradict or explain away any of this damaging testimony. Cooper's counsel, during a colloquy with the court, admitted that Cooper had rented the truck involved on April 3 and offered no explanation as to how this fact could be consistent with his client's claim of innocence. An effort

---

[8] There is conflict between the testimony of Homishak and Dorfman, the former placing the four conspirators on April 3 at a place different from that where Dorfman says they were.

[9] Jeppeson stated that the truck was rented in each case on a Saturday and returned on two occasions early Monday morning, which contradicts Dorfman's testimony that each junket to Pleasantville had been on a Monday morning. Jeppeson was testifying from recollection, unaided by record.

was made on summation to convince the jury that Dorf-
man, who did not have a prior criminal record, was the
killer and had accused these other three, with his wife's
cooperation, in order to save his own life. The tenor of
the defense appears from Cooper's counsel on summation:

> "I don't care whether Cooper is innocent or guilty,
> that is insignificant in the solution of the funda-
> mental problem as to whether the state troopers and
> other enforcing authorities themselves have violated
> far more fundamental principles. . . .
>
> ". . . Don't narrow yourselves into a mere solu-
> tion of a petty murder . . . . Of course, we want a
> solution to that, but that is secondary, if the solution
> of that means that you are going to weaken the very
> foundations of the republic; then you would be unfit
> to be jurors."

Wissner's counsel devoted about half of his summation
to arguing that the murder was not "premeditated"—a
point without legal significance in felony murder under
New York law.

## II. FACTS ABOUT THE CONFESSIONS.

Against this background, we come to the controversy
over the confessions. Uncontroverted evidence estab-
lishes the following:

*Cooper.*—Cooper, who made the first and most cru-
cial confession, was arrested by the state police at 9
o'clock on Monday morning, June 5, under circumstances
previously described. His father, who was with him at
the time, also was arrested. Both were taken to a police
station in New York City, where they were held (but
not booked) until early in the afternoon. Thence, they
were taken to state police headquarters at Hawthorne,
in Westchester County, the county of the offense, arriving
at about 2 o'clock.

At Hawthorne, the Coopers were separated; the father was detained in the police barracks and the son was taken to an office across the courtyard, known as the Bureau of Identification room, where Cooper's interrogation and his ultimate confession took place.

Although Cooper was continuously under guard and handcuffed, no one questioned him until 8 p. m., at which time three officers interrogated him for four or five hours. During this period, Cooper was confronted with his former prison mate, Brassett. However, he did not confess. Questioning was resumed the following day (Tuesday) at 10 a. m. and continued until 6 p. m., the same three officers participating. Just after 6 p. m. Cooper began to discuss confessing. At this time his father was being held at Hawthorne; his brother Morris had been arrested in New York, where his mere presence violated terms of his parole and rendered him subject to disciplinary action. Cooper first obtained a commitment by the police that his father would be released if he confessed. He then asked to see an official of the Parole Board in order to obtain assurance that, if he confessed, his brother Morris would not be prosecuted for parole violation. Accordingly, about 8 p. m. Reardon, an employee of the Parole Board, came to see Cooper, but the latter was not satisfied with his interview. Reardon's superior, Parole Commissioner Donovan, was sent for. Donovan arrived at about 10 p. m. and gave Cooper satisfactory assurance that Morris would be unmolested if Cooper "co-operated." Cooper then confessed orally to Reardon and Donovan. Thus the confession was first imparted, not to the police who are charged with brutality, but to visiting parole officials not so accused and called in at his own request. Thereupon, a typewritten confession was prepared which Cooper signed after making certain corrections, at about 1:30 or 2 on the morning of the 7th. It is twelve pages long, in great detail; it is

corroborated throughout by other evidence, and its general character is such that it could have been fabricated only by a person gifted with extraordinarily creative imagination.

*Stein.*—Stein was arrested at his brother's home at 2 a. m. on the morning of the 6th, before Cooper confessed. He was taken immediately to Hawthorne Barracks and confined in a room in the basement. The following morning, Captain Glasheen, commandant at the barracks, questioned him for an hour. After lunch questioning was resumed, with another officer joining in the questioning, and continued for two or three hours. That evening, Captain Glasheen returned and interrogated Stein from 7 p. m. until 2 a. m., with no result. At 2 a. m., Stein was informed about Cooper's confession and left with the advice to "sleep on it." The following morning, Stein was ready to confess. By afternoon, a statement had been prepared, corrected and signed. This seven-page statement, like Cooper's, was so complete and detailed and so dovetailed with the extrinsic evidence that, if it were not true, its author was possessed of amazing powers of divination.

The following day, Stein went to Pleasantville with two officers and explained on the ground how the crime had been committed.

*Wissner.*—Wissner was arrested about 9 a. m. on June 7—subsequent to Cooper's confession, which implicated him—and taken to Hawthorne, where he remained until his arraignment. He made no confession.

There is no direct testimony that petitioners were subjected to physical violence or the threat of it during their detention.[10] None of the defendants took the wit-

___

[10] The defense sought, unsuccessfully, to introduce an affidavit submitted on a prior motion by Stein's counsel which, according to Stein's brief here, set forth an account which counsel received from

ness stand to substantiate their claims. With one exception, every police officer who had contact with Cooper or Stein during detention was or could have been questioned about it by the defense. The exception came into contact with Stein only and was not shown to have been with him except in the presence of others who were witnesses. Thus, police testimony was consistent and unshaken that no violence or threats were used, that the accused were given food at mealtimes and, with the exceptions we have stated, were allowed to sleep at night.

The defendants' contentions as to physical violence rest entirely on circumstantial evidence. They would be utterly without support except for inferences, which they urge, from the admitted fact that when first physically examined, the day after arraignment, they showed certain bruises and injuries which *could* have been sustained from violent "third-degree" methods. On the morning of June 9, they were examined by the prison physician. Cooper had been in custody at the barracks between three and four days, Stein three days and Wissner two days.

Testimony by the prison doctor who examined them predicated mainly on the notes he made at that time was that Wissner had a broken rib and various bruises and

Stein concerning police brutality. (This affidavit, though marked for identification, was not made part of the record here.) During oral argument on trial, counsel for defendants made many allusions as to violent conduct on the part of the police; and petitioner Cooper made an outburst accusing a police witness of lying, but did not become his own witness. Other than this, defendants took no action to establish their contentions. Prior to the trial, the defendants brought a proceeding in the Supreme Court of Westchester County to have the two confessions suppressed on the ground that they were illegally obtained. The prosecution denied the allegations of police misconduct which the defendants advanced in support of this motion and, in view of the conflict in the evidence, determination of the admissibility of the confessions was postponed until the trial.

abrasions on the side, legs, stomach and buttocks; Cooper had bruises on the chest, stomach, right arm, and both buttocks; Stein had a bruise on his right arm. Counsel for the petitioners, who examined them on the 9th and 10th of June, testified that the injuries sustained by each were more extensive than those described in the doctor's testimony.

The record stands that the injuries were of such nature that they might have been received prior to arrest; [11] indeed, one of the petitioners—Wissner, who exhibited perhaps the worst of the injuries but never confessed—was undergoing treatment at the time he was arrested.[12]

### III. CONSTITUTIONALITY OF PROCEDURES EMPLOYED BELOW.

In the setting of these facts, the constitutional issues raised by petitioners involve procedural features not heretofore adjudicated by this Court. In view of the uncontradicted direct as well as circumstantial evidence against the defendants, the part, if any, played by the confessions in the conviction is uncertain. The jury was instructed to consider the confessions only if it found them to have been voluntary. It rendered a general verdict of guilty.

Under these circumstances, we cannot be sure whether the jury found the defendants guilty by accepting and relying, at least in part, upon the confessions or whether it rejected the confessions and found them guilty on the other evidence. Indeed, except as we rely upon a presumption that the jurors followed instructions, we cannot

---

[11] Dr. Vosburgh, the physician who had examined petitioners on June 9, testified that it was difficult to state exactly how long the bruises had been there; that the bruises on Cooper's body could have been as much as six days old (he had been in custody three days); and that Stein's bruises could have been sustained prior to arrest.

[12] This evidence was hearsay, but was not objected to by the defendants.

know that some jurors may not have acted upon one basis, while some convicted on the other. Also, since the Court of Appeals affirmed without opinion, we are not certain whether it did so on the ground that the confessions were properly relied on or that even without them the verdict was adequately supported.[13]

The New York procedures in this case therefore must be examined, not only as to their own constitutionality, but as to their consequences if valid, and the weight to be given to conclusions so reached.

The ideal of fair procedure was self-imposed by New York long before it was imposed upon her. New York's Constitution has enjoined observance of due process of law at least since 1821,[14] and statute law has provided for exclusion from evidence of coerced confessions since 1881.[15] The Court of Appeals is charged by the State with ultimate authority in such a case as this to adjudge and redress violations of that mandate.

Their appeal, taken as matter of right, afforded petitioners a review with a latitude much wider than is permitted to us. That court, in a death case, is empowered by statute to order a new trial for errors of law, or if the

---

[13] A prior decision of the Court of Appeals indicates that it will reverse whenever a coerced confession appears in evidence, regardless of the other evidence. See *People* v. *Leyra,* 302 N. Y. 353, 364, 98 N. E. 2d 553, 559. However, it appears probable that the court there was applying a doctrine, not of New York law, but one which it considered to be imposed by this Court and the Fourteenth Amendment. The New York rule does not appear to us to be free from doubt. See *People* v. *Fisher,* 249 N. Y. 419, 426, 164 N. E. 336, 338; *People* v. *Samuels,* 302 N. Y. 163, 173, 96 N. E. 2d 757, 762; *People* v. *Leyra,* 304 N. Y. 468, 108 N. E. 2d 673.

[14] N. Y. Const., Art. I, § 6.

[15] N. Y. Code Crim. Proc., § 395. Prior to 1881, coerced confessions were excluded under common-law doctrines of evidence. See *People* v. *Mondon,* 103 N. Y. 211, 8 N. E. 496; *People* v. *McMahon,* 15 N. Y. 384.

conviction is found to be "against the weight of evidence," or if the court is satisfied for any reason whatever "that justice requires a new trial." [16]   Even where it finds that the jury could "reasonably credit the denial of the police," if it considers that the prosecution had failed to produce all reasonably available evidence to clear charges of coercion, it will order "a new trial where there can be a more adequate search for the truth."   *People* v. *Mummiani,* 258 N. Y. 394, 401, 403, 180 N. E. 94, 97, 98.

Although, even within this range, the Court of Appeals found no cause for upsetting this conviction, our review penetrates its judgment and searches the record in the trial court.

The procedure adopted by New York for excluding coerced confessions relies heavily on the jury.  It requires a preliminary hearing as to admissibility, but does not permit the judge to make a final determination that a confession is admissible.  He may—indeed, must—exclude any confession if he is convinced that it was *not* freely made or that a verdict that it was so made would be against the weight of evidence.  But, while he may thus cast the die against the prosecution, he cannot do so against the accused.  If the voluntariness issue presents a fair question of fact, he must receive the confession and leave to the jury, under proper instructions, the ultimate determination of its voluntary character and also its truthfulness.  *People* v. *Weiner,* 248 N. Y. 118, 161 N. E. 441.  The judge is not required to exclude the jury while he hears evidence as to voluntariness, *People* v. *Brasch,* 193 N. Y. 46, 85 N. E. 809, and perhaps is not permitted to do so, *People* v. *Randazzio,* 194 N. Y. 147, 159, 87 N. E. 112, 117.

The trial court held a preliminary hearing as to admissibility of these confessions before the jury.  No de-

---

[16] N. Y. Code Crim. Proc., § 528.

fendant objected or requested a hearing with the jury absent. The court advised counsel for each defendant that he might cross-examine all witnesses called by the State and offer any on his own behalf, and both privileges were exercised. The judge ruled that a question of fact resulted, which he submitted under instructions which authorized the jury to find the confessions coerced not only because of "force and intimidation and fear" but also for any "implied coercion because of the manner in which they [the confessors] were kept in custody," and on both grounds the burden to prove beyond reasonable doubt was placed upon the State.[17]

---

[17] The jury were instructed as follows:

"Ladies and gentlemen, there have been received in evidence statements alleged to have been made by the defendant Calman Cooper and the defendant Harry A. Stein. It is the contention of the People that these statements are in the nature of confessions and that they were made freely and voluntarily. On the other hand, it is the contention made on behalf of the defendant Calman Cooper and on behalf of the defendant Harry A. Stein that these alleged confessions are valueless as evidence against either of them, because it is contended on behalf of each of these defendants that these statements were made because of force and intimidation and fear visited upon each of them by certain members of the state police and implied coercion because of the manner in which they were kept in custody from the time of apprehension until the alleged confessions were made. You must find beyond a reasonable doubt that these confessions, or either of them, was a voluntary one before you would have a right to consider either of them.

"I charge you that the law of this State with respect to a confession is this, that a confession made by a defendant, whether in the course of a judicial proceeding or to a private person, can be given in evidence against him unless made under the influence of fear produced by threats . . . ."

The judge further instructed them that if they found that the confessions were voluntary they were then to consider whether their contents, or any part of them, were true.

The jury also was instructed that they should not consider a state-

New York procedure does not leave the outcome finally to the caprice of a lay jury, unfamiliar with the techniques of trial practice. The trial judge, too, has a heavy responsibility resulting from broad powers to set aside a verdict if he thinks the evidence does not warrant it.[18] Petitioners submitted such a motion, which the judge denied, thus adding the weight of his own approval to the jury verdict.

An attack on the fairness of New York procedure is that petitioners could not take the witness stand to support, with their own oaths, the charges their counsel made against the state police without becoming subject to general cross-examination. State law on the subject is disputed and uncertain. It is clear that the Court of Appeals would not have held it error had such witnesses been subjected to general cross-examination.[19] Respondents, however, contend, and petitioners deny, that it is the practice of trial courts to limit cross-examination under these circumstances, and each cites records of prosecutions to confirm its position.

It is not impossible that cross-examination could be employed so as to work a denial of due process. But no basis is laid for such a contention here. Appellate courts

---

ment by one defendant as any evidence of guilt against any other defendant.

These portions of the court's charge were not objected to.

For the first time, the petitioners here claim that this charge set forth the requirements for voluntariness under state law, but did not set forth the requirements for voluntariness under the Fourteenth Amendment. They construe the court's charge as instructing the jury that "implied coercion" does not make a confession involuntary. We do not agree with their construction of the charge, and the fact that no objection was made to it indicates that they did not so construe it at the time it was made. In any event, failure to object made the matter unavailable here.

[18] N. Y. Code Crim. Proc., § 465.

[19] See *People* v. *Trybus,* 219 N. Y. 18, 113 N. E. 538.

leave an exceptional discretion to trial courts to prevent abuse and injustice. But here the defendants took no step which would call for or permit an exercise of such discretion. They made no request for a ruling by the trial court and made no offer or suggestion of readiness to testify, however restricted the cross-examination might be.[20] We do not know whether, or how far, the court would have permitted any line of cross-examination, nor what specific limitation defendants would have claimed. We will not adjudge a trial court guilty of constructive abuse by imputing to it a ruling that never was made on a proposition that never was put to it.

Petitioners' attack is so unbounded and unqualified that it could prevail only if the Fourteenth Amendment were construed to allow them to testify to their coercion by the police, shielded from any cross-examination whatever. If they had given such testimony, it would have been in direct conflict with that of the police, and the decision would depend on which was believable. Certainly the Constitution does not prohibit tests of credibility which American law uniformly applies to witnesses. If in open court, free from violence or threat of it, defendants had been obliged to admit incriminating facts, it might bear on the credibility of their claim that the same facts were admitted to the police only in response to beating. And if they became

---

[20] As was done, without success, in *Witt* v. *United States*, 196 F. 2d 285. In *Witt*, the defendant had testified in the absence of the jury—as he could under federal procedure—as to the voluntariness of a confession. After the court had determined that it was admissible, the defendant sought to testify further on the same subject in the presence of the jury, but requested an order in advance from the court that if he did so cross-examination would be restricted to what had been said on direct. The court refused to so order, and defendant refrained from taking the stand. See also *Raffel* v. *United States*, 271 U. S. 494, 497.

witnesses, does the Constitution compel the State to forego attack on their credibility by showing former convictions? We now know that each had an impressive felony record, one including murder and another perjury.[21] Doubtless, to have testified would have resulted in disclosing this to the jury, while silence would keep it from being brought to light until after the verdict. We think, on any realistic view of this case, they stayed off the stand not because the State would subject them to any improper cross-examination but because their records made them vulnerable to any proper one.

The State did not seek to draw any inference adverse to defendants from their choice of silence, cf. *Adamson* v. *California,* 332 U. S. 46, beyond the obvious fact that their confessions have not been repudiated, their charge of police violence is left without testimonial support, and

---

[21] Petitioners' prior convictions were as follows:

COOPER

| | | | | |
|---|---|---|---|---|
| 1928 | Waycross, Ga. | Auto theft | Probation | 2 years. |
| 1930 | Norfolk, Va. | Auto theft | Atlanta | 3 years. |
| 1934 | Brooklyn, N. Y. | Attempted grand larceny. | | 3 years (suspended). |
| 1934 | Brooklyn, N. Y. | Murder | Sing Sing | 20 years to life. |
| 1948 | U. S. Court, N. Y. C. | Dyer Act | Lewisburg | 3 years. |

STEIN

| | | | | |
|---|---|---|---|---|
| 1918 | New York | Grand larceny | | Sentence suspended. |
| 1918 | New York | Petty larceny | | Sentence suspended. |
| 1921 | Bronx, N. Y. | Robbery | Sing Sing | 10 years. |
| 1931 | New York | Robbery | Sing Sing | 25 years. |
| 1933 | U. S. Court, N. Y. C. | Perjury | Lewisburg | 2 years. |

WISSNER

| | | | | |
|---|---|---|---|---|
| 1928 | Brooklyn, N. Y. | Attempted robbery. | Reform School, Elmira, N. Y. | |
| 1934 | Westchester Co | Robbery | Sing Sing | 15 years. |

the police account of the confessions is undenied. In trial of a coercion issue, as of every other issue, when the prosecution has made a case to go to the jury, an accused must choose between the disadvantage from silence and that from testifying. The Constitution safeguards the right of a defendant to remain silent; it does not assure him that he may remain silent and still enjoy the advantages that might have resulted from testifying. We cannot say that petitioners have been denied a fair hearing of the coercion charge.

Petitioners suffer a disadvantage inseparable from the issues they raise in that this procedure does not produce any definite, open and separate decision of the confession issue. Being cloaked by the general verdict, petitioners do not know what result they really are attacking here. For all we know, the confession issue may have been decided in their favor. The jury may have agreed that the confessions were coerced, or at least that the State had not met the burden of proving beyond a reasonable doubt that they were voluntary. If the method of submission is, as we believe, constitutional, it leaves us to review hypothetical alternatives.

This method of trying the coercion issue to a jury is not informative as to its disposition. Sometimes the record permits a guess or inference, but where other evidence of guilt is strong a reviewing court cannot learn whether the final result was to receive or to reject the confessions as evidence of guilt. Perhaps a more serious, practical cause of dissatisfaction is the absence of any assurance that the confessions did not serve as makeweights in a compromise verdict, some jurors accepting the confessions to overcome lingering doubt of guilt, others rejecting them but finding their doubts satisfied by other evidence, and yet others or perhaps all never reaching a separate and definite conclusion as to the confessions but returning an unanalytical and impressionistic verdict

based on all they had heard. Courts uniformly disapprove compromise verdicts but are without other means than admonitions to ascertain or control the practice. Defendants, when two or more issues are submitted, are entitled to instructions appropriate to discountenance, discourage and forbid such practice. However, no question is raised in this respect as to the charge in this case.

In civil cases, certainty and exposure of the process is sometimes sought by the special verdict or by submission of interrogatories. *E. g.,* Fed. Rules Civ. Proc., 49. But no general practice of these techniques has developed in American criminal procedure. Our own Rules of Criminal Procedure make no provision for anything but a general verdict. Indeed, departure from this has sometimes been resisted as an impairment of the right to trial by jury, see *People* v. *Tessmer,* 171 Mich. 522, 137 N. W. 214; *State* v. *Boggs,* 87 W. Va. 738, 106 S. E. 47, which usually implies one simple general verdict that convicts or frees the accused.

Nor have the courts favored any public or private post-trial inquisition of jurors as to how they reasoned, lest it operate to intimidate, beset and harass them. This Court will not accept their own disclosure of forbidden quotient verdicts in damage cases. *McDonald* v. *Pless,* 238 U. S. 264. Nor of compromise in a criminal case whereby some jurors exchanged their convictions on one issue in return for concession by other jurors on another issue. *Hyde* v. *United States,* 225 U. S. 347. "If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference." *McDonald* v. *Pless, supra,* at 267–268.

But this inability of a reviewing court to see what the jury has really done is inherent in jury trial of any two or more issues, and departure from instruction is a risk

inseparable from jury secrecy and independence. The uncertainty, while the cause of concern and dissatisfaction in the literature of the profession, does not render the customary jury practice unconstitutional.

The Fourteenth Amendment does not forbid jury trial of the issue. The states are free to allocate functions as between judge and jury as they see fit. Cf. *Walker* v. *Sauvinet,* 92 U. S. 90; *Minneapolis & St. L. R. Co.* v. *Bombolis,* 241 U. S. 211. Many states emulate the New York practice,[22] while others hold that presence of the jury during preliminary hearing is not error.[23] Despite the difficult problems raised by such jury trial, we will not strike down as unconstitutional procedures so long established and widely approved by state judiciaries, regardless of our personal opinion as to their wisdom.

We have, therefore, to consider the constitutional effect of both alternatives left to the jury by the court's instruction, assuming it to have followed one or the other. They involve very different considerations and are best discussed separately.

IV. Was it Unconstitutional if These Confessions Were Used as the Basis of Conviction?

Since these convictions may rest in whole or in part upon the confessions, we must consider whether they are a constitutionally permissible foundation for a finding of guilt.

Inquiries on which this Court must be satisfied are: (1) Under what circumstances were the confessions obtained? (2) Has the use of the confessions been repugnant to "that fundamental fairness essential to the very concept of justice"? *Lisenba* v. *California,* 314 U. S. 219,

---

[22] See cases cited in 3 Wigmore on Evidence (3d ed.) § 861.

[23] See Annotation in 148 A. L. R. 546. Cf. *United States* v. *Carignan,* 342 U. S. 36, 38, for the rule in federal courts.

236. The first is identical with that litigated before the trial court and jury. The second is within, if not identical with, those questions considered by the state appellate court. As to both questions, we have the identical evidence that was before both state courts. At the threshold of our inquiry, therefore, lies the question: What, if any, weight do we give to the verdict of the jury, the rulings of the trial judge and the determination of the state appellate court?

Petitioners' argument here essentially is that the conclusions of the New York judges and jurors are mistaken and that by reweighing the same evidence we, as a superjury, should find that the confessions were coerced. This misapprehends our function and scope of review, a misconception which may be shared by some state courts with the result that they feel a diminished sense of responsibility for protecting defendants in confession cases.[24]

---

[24] The Texas Court of Criminal Appeals in *Newman v. State*, 148 Tex. Cr. R. 645, 651–652, 187 S. W. 2d 559, 562–563, said:

"The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused at the time he confesses is in possession of mental freedom to confess or to deny a suspected participation in a crime and to determine which the Supreme Court of the United States will itself make an independent examination of the facts and, from that examination, reach a conclusion based upon what it finds to be the conceded and uncontroverted facts.

.    .    .    .    .

". . . [T]here is no escape from the conclusion that the Supreme Court of the United States has potential jurisdiction in all State cases where it is claimed by the accused that the conviction was based upon his involuntary confession.

"Such being true, the position this Court occupies in relation to such cases is both unique and difficult—unique, in that by the Constitution and the laws of this State (Const. Art. 5, sec. 5; Art. 812, C. C. P.) we are the court of last resort in criminal cases. If we reach a conclusion that the confession was involuntary, such

Of course, this Court cannot allow itself to be completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding. But that does not mean that we give no weight to the decision below, or approach the record *de novo* or with the latitude of choice open to some state appellate courts, such as the New York Court of Appeals. Mr. Justice Brandeis, for this Court, long ago warned that the Fourteenth Amendment does not, in guaranteeing due process, assure immunity from judicial error. *Milwaukee Electric Railway & Light Co.* v. *Milwaukee,* 252 U. S. 100, 106. It is only miscarriages of such gravity and magnitude that they cannot be expected to happen in an enlightened system of justice, or be tolerated by it if they do, that cause us to intervene to review, in the name of the Federal Constitution, the weight of conflicting evidence to support a decision by a state court.

It is common courtroom knowledge that extortion of confessions by "third-degree" methods is charged falsely as well as denied falsely. The practical problem is to separate the true from the false. Primary, and in most cases final, responsibility for determining contested facts rests, and must rest, upon state trial and appellate courts.

A jury and the trial judge—knowing local conditions, close to the scene of events, hearing and observing the witnesses and parties—have the same undeniable advantages over any appellate tribunal in determining the charge of coercion of a confession as in determining the

conclusion is binding upon the State and society, for under our Constitution (Art. 5, sec. 26) the State is expressly denied the right of appeal in a criminal case and is therefore barred from seeking a review of that conclusion by the Supreme Court. On the other hand, if we conclude that the confession was voluntary, such conclusion is in no sense final, binding the accused only until reviewed by the Supreme Court of the United States."

main charge of guilt of the crime. When the issue has been fairly tried and reviewed, and there is no indication that constitutional standards of judgment have been disregarded, we will accord to the state's own decision great and, in the absence of impeachment by conceded facts, decisive respect. *Gallegos* v. *Nebraska,* 342 U. S. 55, 60; *Lyons* v. *Oklahoma,* 322 U. S. 596, 602–603; *Lisenba* v. *California,* 314 U. S. 219.

Accordingly, we accept this verdict and judgment as a permissible resolution of contradictions in evidence or conflicting inferences unless, as is urged, undisputed facts indicate use of incorrect constitutional standards of judgment. This may best be determined by separate examination of the following conclusions, implicit in the judgments below: (1) that these confessions were not extorted by physical coercion; (2) that these confessions were not extorted by methods which, though short of physical coercion, were so oppressive as to render the confessions inadmissible; and (3) that admitted illegal detention of petitioners at the time of the confessions did not render them inadmissible.

1. *Physical violence.*—Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law. When present, there is no need to weigh or measure its effects on the will of the individual victim. The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture or threat of brutality as too untrustworthy to be received as evidence of guilt.

Admitted injuries and bruises on defendants' bodies after arraignment were mute but unanswerable witnesses

that their persons recently had been subjected to violence from some source. Slight evidence, even interested testimony, that it occurred during the period of detention or at the hands of the police, or failure by the prosecution to meet the charge with all reasonably available evidence, might well have tipped the scales of decision below.[25] Even here, it would have force if there were any evidence whatever to connect the admitted injuries with the events or period of interrogation. But there is no such word in the record.

On the contrary, we have positive testimony of the police, not materially inconsistent or inherently improbable, unshaken on cross-examination. The only expert testimony on the subject is undisputed and is that the injuries may have been sustained before arrest. This becomes more than a possibility when we consider that neither defendants nor anyone else tells us what defendants were up to in the period just prior to arrest. We are not convinced from their criminal records and way of life as now known to us, though not to the jury, that their free days or nights were secure from violence. This, with the whole evidence concerning the confessions, leaves us no basis for throwing out the decisions of the courts below, unless we simply prefer the unsworn claims of defendants' counsel against the evidence.

As to the inferences to be drawn from unexplained injuries, under these circumstances, we should defer to the advantages of trial judge and jury. For seven weeks they observed the day-to-day demeanor of defendants, their attitudes and reactions; all the knowledge we have of their personalities is still photographs of two of them. The trial judge and jury also for long periods could observe the police officers whose conduct was in question, knew not only what they answered but how they an-

---

[25] See *People* v. *Barbato*, 254 N. Y. 170, 172 N. E. 458.

swered, could form some opinions of their attitudes—of the personal characteristics which never can get into a printed record but which make for belief or unbelief that they were guilty of cruelty and violence.

We determine that the state court could properly find that the confessions were not obtained by physical force or threats.

2. *Psychological coercion.*—Psychological coercion is claimed as a secondary contention. It is urged that admitted facts show psychological pressure by interrogation, such as to overpower these petitioners' mental resistance and induce involuntary confessions. Of course, a process of interrogation can be so prolonged and unremitting, especially when accompanied by deprivation of refreshment, rest or relief, as to accomplish extortion of an involuntary confession.

But the inquiry as to such allegations has a different point of departure. Interrogation is not inherently coercive, as is physical violence. Interrogation does have social value in solving crime, as physical force does not. By their own answers many suspects clear themselves, and the information they give frequently points out another who is guilty. Indeed, interrogation of those who know something about the facts is the chief means to solution of crime. The duty to disclose knowledge of crime rests upon all citizens. It is so vital that one known to be innocent may be detained, in the absence of bail, as a material witness.[26] This Court never has held that the Fourteenth Amendment prohibits a state from such detention and interrogation of a suspect as under the circumstances appears reasonable and not coercive.

Of course, such inquiries have limits. But the limits are not defined merely by calling an interrogation an "in-

---

[26] N. Y. Code Crim. Proc., § 618-b; cf. Fed. Rules Crim. Proc., 46 (b).

quisition," which adds to the problem only the emotions inherited from medieval experience. The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.

Both Stein and Cooper confessed only after about twelve hours of intermittent questioning. In each case this was stretched out over a 32-hour period, with the suspect sleeping and eating in the interim. In the case of Cooper, a substantial part of this time he spent driving a bargain with the police and the parole officers. It also is true that the questioning was by a number of officers at a time and by different officers at different times. But we cannot say that the use of successive officers to question these petitioners for the periods of time indicated is so oppressive as to overwhelm powers of resistance. While we have reversed convictions founded on confessions secured through interrogations by "relays," [27] we have also sustained conviction when, under different circumstances, the relay technique was employed.[28] But we have never gone so far as to hold that the Fourteenth Amendment requires a one-to-one ratio between interrogators and prisoners, or that extensive questioning of a prisoner automatically makes the evidence he gives in response constitutionally prohibited.

The inward consciousness of having committed a murder and a robbery and of being confronted with evidence of guilt which they could neither deny nor explain seems enough to account for the confessions here. These men were not young, soft, ignorant or timid. They were not

[27] *Malinski* v. *New York*, 324 U. S. 401; *Watts* v. *Indiana*, 338 U. S. 49; *Turner* v. *Pennsylvania*, 338 U. S. 62; *Harris* v. *South Carolina*, 338 U. S. 68; *Ashcraft* v. *Tennessee*, 322 U. S. 143.

[28] *Lisenba* v. *California, supra,* at 229, 239.

inexperienced in the ways of crime or its detection, nor were they dumb as to their rights. At the very end of his interrogation, the spectacle of Cooper naming his own terms for confession, deciding for himself with whom he would negotiate, getting what he wanted as a consideration for telling what he knew, reduces to absurdity his present claim that he was coerced into confession. Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary.

Cooper's and Stein's confessions obviously came when they were convinced that their dance was over and the time had come to pay the fiddler. Even then, Cooper was so far in control of himself and the situation as to dictate the *quid pro quo* for which he would confess. That confession came at a time when he must have known that the police already knew enough, from Jeppeson and Brassett, to make his implication inevitable. Stein held out until after Cooper had confessed and implicated him.[29] Both confessions were "voluntary," in the only sense in which confessions to the police by one under arrest and suspicion ever are. The state courts could properly find an absence of psychological coercion.

3. *Illegal detention.*—Illegal detention alone is said to void these confessions. All three of the prisoners were held incommunicado at the barracks until the evening of June 8, when they were taken before a nearby magistrate and arraigned. This delay in arraignment was held by the trial judge to be unreasonable as a matter

---

[29] An officer testified that, subsequent to his confession, "He [Stein] said 'That rotten — — — — Cooper, it is hard to believe he would put me in the way he did; he put me right into the . . .' [continuing]—into the seat; I was the best friend he ever had; well, if I must go, I will take him with me."

of law and a violation of the statutes of the State of New York.[30] However, such delay does not make a confession secured during such period of illegal detention necessarily inadmissible as a matter of New York law.[31]

To delay arraignment, meanwhile holding the suspect incommunicado, facilitates and usually accompanies use of "third-degree" methods. Therefore, we regard such occurrences as relevant circumstantial evidence in the inquiry as to physical or psychological coercion. As such, it was received and the jury was instructed to consider it in this case. But the petitioners' contention here goes farther—it is that the delayed arraignment compelled the rejection of the confessions.

Petitioners confuse the more rigid rule of exclusion which, in the exercise of our supervisory power,[32] we have promulgated for federal courts with the more limited requirements of the Fourteenth Amendment.[33] This, we have held, did not impose rules of evidence on state courts which bind them to exclude a confession because, without

---

[30] Under New York law, a defendant must be promptly taken before a magistrate, Code of Criminal Procedure, § 165, and failure to do so renders the arresting officer liable to criminal prosecution. N. Y. Penal Law, § 1844.

[31] Under New York law, the fact that a confession was given during a period of illegal detention is one factor to be considered in determining whether or not it was voluntary; but it does not make the confession inadmissible *per se*. *People* v. *Trybus*, 219 N. Y. 18, 113 N. E. 538; *People* v. *Mummiani*, 258 N. Y. 394, 180 N. E. 94.

[32] Admissibility in federal courts is governed by "principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. Rules Crim. Proc., 26.

[33] Compare *McNabb* v. *United States*, 318 U. S. 332, with *Stroble* v. *California*, 343 U. S. 181, 197; *Weeks* v. *United States*, 232 U. S. 383, with *Wolf* v. *Colorado*, 338 U. S. 25; *Nardone* v. *United States*, 302 U. S. 379, and *Weiss* v. *United States*, 308 U. S. 321, 329, with *Schwartz* v. *Texas*, 344 U. S. 199. See also *United States* v. *Carignan*, 342 U. S. 36.

coercion, it was obtained while a prisoner was uncounseled and illegally detained. *Stroble* v. *California*, 343 U. S. 181, 197; *Lisenba* v. *California*, 314 U. S. 219.

From the foregoing considerations, we conclude that if the jury resolved that the confessions were admissible as a basis for conviction it was not constitutional error.

## V. IF THE JURY REJECTED THE CONFESSIONS, COULD IT CONSTITUTIONALLY BASE A CONVICTION ON OTHER SUFFICIENT EVIDENCE?

Petitioners raised this question by a request for instruction to the jury that if it found the confessions to have been coerced it must return a verdict of acquittal. This was refused. Their principal authority for the requested charge is *Malinski* v. *New York*, 324 U. S. 401, which was tried by the same procedure followed here. This Court reversed the conviction and the opinion of four Justices said of the confession found therein to have been coerced (p. 404): "And if it is introduced at the trial, the judgment of conviction will be set aside even though the evidence apart from the confession might have been sufficient to sustain the jury's verdict." Similar expressions are to be found in other cases.

It is hard to see why a jury should be allowed to return a verdict which cannot be allowed to stand. If having heard an illegally obtained confession prevents a legal verdict of guilty on other sufficient evidence, why permit return of one foredoomed to be illegal? The alternative, of course, is an acquittal, which is what petitioners asked.

The claim is far-reaching. There can be no jury trial of the coercion issue without bringing to the knowledge of the jurors the fact of confession and usually its contents. But American practice has evolved no technique for learning, through special verdict or otherwise, what part the knowledge plays in the result. Hence the dilemma of this case is always present, if not presented in

earlier cases. If this uncertainty invalidates any conviction or requires an acquittal, it is a grave matter, for most states, like New York, permit no prosecution after acquittal.[34] This would go far toward making it impracticable to submit the issue of coercion to the jury, a traditional practice assumed on the whole to be of advantage to the defense and an additional protection to the accused.

The claim also is novel. This Court never has decided that reception of a confession into evidence, even if we held it to be coerced, requires an acquittal or discharge of a defendant. On the contrary, this Court has returned all such cases for retrial, which we should not have done if obtaining and attempted use of a coerced confession were enough to require acquittal.

It is not deniable that apart from the *Malinski* statement there have been other similar utterances. *Lyons* v. *Oklahoma,* 322 U. S. 596, 597 (footnote); *Stroble* v. *California,* 343 U. S. 181, 190; *Gallegos* v. *Nebraska,* 342 U. S. 55, 63. It is clear, however, that these statements were *dicta* about a proposition not essential to the result, since in each instance those confessions were sustained and the convictions affirmed. And, of course, the present consequences were not asserted or argued at the bar nor anticipated or approved by anything appearing in the opinions.

Except in *Malinski,* the question presented here could not have been raised or decided. This Court's power to reverse such a conviction was first exerted in *Brown* v. *Mississippi,* 297 U. S. 278, in which the *only* evidence in the trial consisted of a confession admittedly secured through mob violence. The Court there reasoned that if the defendant's "trial" consisted solely of the introduction of such evidence, he had only a "mere pretense" of a trial; the actual trial had occurred during the extortion of the confession, and the subsequent pro-

---

[34] N. Y. Const., Art. I, § 6.

ceeding was only a formal ratification of the mob's action.
Such a proceeding would be a violation of the Due Process
Clause under even the most restricted view. In *Ash-craft* v. *Tennessee,* 322 U. S. 143, 145, and *Ward* v. *Texas,*
316 U. S. 547, we noted that without the confession there
could be no conviction. And in *Lyons,* there was no cred-ible evidence of guilt in the record except the confession;
in the *Gallegos* case, it is noted that conviction without
the confession "would logically have been impossible"
(p. 60) and this Court therefore assumed that the jury
found the statements voluntary.

Against this factual background, we do not think our
cases establish that to submit a confession to a state jury
for judgment of the coercion issue automatically disquali-fies it from finding a conviction on other sufficient evi-dence, if it rejects the confession.[35] Here the evidence of

---

[35] *Bram* v. *United States,* 168 U. S. 532, has been cited as authority,
for the proposition that an inadmissible confession automatically
requires reversal, because of this language (p. 541): "Having been
offered as a confession and being admissible only because of that fact,
a consideration of the measure of proof which resulted from it does
not arise in determining its admissibility. If found to have been
illegally admitted, reversible error will result, since the prosecution
cannot on the one hand offer evidence to prove guilt, and which
by the very offer is vouched for as tending to that end, and on the
other hand for the purpose of avoiding the consequences of the error,
caused by its wrongful admission, be heard to assert that the matter
offered as a confession was not prejudicial because it did not tend
to prove guilt." But the language, while superficially applicable
to the question at hand, was addressed to no such problem in the
*Bram* case. There the prosecution had introduced into evidence a
conversation between an illegally held and uncounseled prisoner and
a detective in which the prisoner stated, in reply to an allegation
that one "X" had seen the prisoner commit a crime from his vantage
point at a ship's wheel, that "he [X] could not see me from there."
The Government took the position in the *Bram* case that this state-ment, even if not voluntary, was not a confession, since its author

guilt, consisting of direct testimony of the surviving victim, Waterbury, and the well-corroborated accomplice, Dorfman, as well as incriminating circumstances unexplained, is enough apart from the confessions so that it could not be held constitutionally or legally insufficient to warrant the jury verdict. Indeed, if the confessions had been omitted and the convictions rested on the other evidence alone, we would find no grounds to review, not to mention to reverse them.

We would have a different question if the procedure had been that which may have been in mind when some of our cases were written. Of course, where the judge makes a final determination that a confession is admissible and sends it to the jury as a part of the evidence to be considered on the issue of guilt and the ruling admit-

---

purported to deny, not admit, guilt. The quoted language of the Court is the answer to this position. As the Court points out, the evidence was introduced on the theory that it tended to admit guilt, and only on that theory would it have been admissible. It therefore must be treated as a confession. The sentences immediately preceding the quoted language bring this out: "It is manifest that the sole ground upon which the proof of the conversation was tendered was that it was a confession, as this was the only conceivable hypothesis upon which it could have been legally admitted to the jury. It is also clear that in determining whether the proper foundation was laid for its admission, we are not concerned with how far the confession tended to prove guilt."

Thus, *Bram* merely decided that a confession otherwise erroneous could not be used merely because the defendant claimed that it did not incriminate him. This is precisely what this Court subsequently held in *White* v. *Texas,* 310 U. S. 530.

In any event, the *Bram* case was a federal case where we exercised supervisory power rather than merely enforced the Fourteenth Amendment. It is not a rock upon which to build constitutional doctrine. According to Wigmore (3d ed., Vol. 3, pp. 240–241, n. 2), this decision represents "the height of absurdity in misapplication of the law," and has been discredited by subsequent cases.

ting the confession is found on review to be erroneous, the conviction, at least normally, should fall with the confession.

But here the confessions are put before the jury only tentatively, subject to its judgment as to voluntariness and with binding instructions that they be rejected and ignored unless found beyond reasonable doubt to have been voluntary. By petitioners' hypothesis on this point, the jury itself rejected the confessions. The ample other evidence makes this a possible, if not very convincing, explanation of the verdict. By the very assumption, however, there has been no error, for the confessions finally were rejected as the free choice of the jury.

We could hold that such provisional and contingent presentation of the confessions precludes a verdict on the other sufficient evidence after they are rejected only if we deemed the Fourteenth Amendment to enact a rigid exclusionary rule of evidence rather than a guarantee against conviction on inherently untrustworthy evidence. We have refused to hold it to enact an exclusionary rule in the case of other illegally obtained evidence. *Wolf* v. *Colorado,* 338 U. S. 25; *Schwartz* v. *Texas,* 344 U. S. 199; *Snyder* v. *Massachusetts,* 291 U. S. 97. See *Adamson* v. *California,* 332 U. S. 46; *United States* v. *Carignan,* 342 U. S. 36. Coerced confessions are not more stained with illegality than other evidence obtained in violation of law. But reliance on a coerced confession vitiates a conviction because such a confession combines the persuasiveness of apparent conclusiveness with what judicial experience shows to be illusory and deceptive evidence. A forced confession is a false foundation for any conviction, while evidence obtained by illegal search and seizure, wire tapping, or larceny may be and often is of the utmost verity. Such police lawlessness therefore may not void state convictions while forced confessions will do so.

We find no error in refusing the instruction asked in this case.

But this does not exhaust petitioners' arsenal of objections. They argue that even if the jury were permitted to find the verdict, a reviewing court must set it aside. They say that affirmance without opinion may mean that, while the Court of Appeals thought the treatment of the confessions erroneous, it may have affirmed on the basis that, in view of other sufficient evidence, the error was harmless. The New York statute,[36] like the Federal Rules of Criminal Procedure,[37] commands reviewing courts to disregard errors and irregularities which do not affect substantial rights. That such a general legislative mandate is constitutional is not in question. If the general rule is not prohibited, the question in each case becomes one as to the propriety of its application to the evidence. In a trial such as this, lasting seven weeks, where objections by three defense counsel required in excess of three hundred rulings by the trial court without the long deliberation and debate possible for appellate court consideration, it would be a miracle if there were not some questions on which an appellate court would rule otherwise than did the trial judge. The harmless-error statutes have been adopted to give discretion to overlook errors which cannot be seen to do injustice.

But, whatever may have been the grounds of the Court of Appeals, we base our decision, not upon grounds that error has been harmless, but upon the ground that we find no constitutional error. We have pointed out that it was not error if the jury admitted and relied on the confession and was not error if they rejected it and convicted on

---

[36] N. Y. Code Crim. Proc., § 542.
[37] Fed. Rules Crim. Proc., 52 (a).

other evidence.    To say that although there was no error in the trial an appellate court must reverse would require justification by more authority than we are able to discover.

## VI. Wissner's Case.

Wissner's case is somewhat different and its disposition involves other considerations.    Wissner never confessed, but he was implicated by those who did.    His objections raise questions of admissibility of the confessions to which he was not a party.

However, we find as regards Wissner no constitutional error such as would justify our setting aside his conviction.

Our holding that it was permissible for the state courts to find that the confessions were voluntary takes away the support for Wissner's position here.    But, even if the confessions were considered to have been involuntary, their use would not have violated any federal right of Wissner's.  *Malinski* v. *New York,* 324 U. S. 401, 410–412. This Court there refused to reverse the conviction of Rudish, a codefendant of Malinski who had been named in the latter's confession.    It is true that Rudish's name was there deleted and an "X" substituted in its place before the jury got the confession.    Use of this device does not appear to have been controlling in the Court's decision and Mr. Justice Rutledge, dissenting, pointed out what no one questioned, that "The devices were so obvious as perhaps to emphasize the identity of those they purported to conceal."    P. 430.    On remand, the New York Court of Appeals on its own initiative ordered a new trial for Rudish as well as Malinski.    294 N. Y. 500, 63 N. E. 2d 77.    Surely in the light of the other testimony such a deletion from the confessions here would not have diverted their incriminating statements from Wissner to an anonymous nobody.

Wissner, however, contends that his federal rights were infringed because he was unable to cross-examine accusing witnesses, *i. e.*, the confessors. He contends that the "privilege of confrontation" is secured by the Fourteenth Amendment, relying on one sentence in *Snyder* v. *Massachusetts*, 291 U. S. 97, 107.[38] However, the words cited were quoted verbatim from *Dowdell* v. *United States*, 221 U. S. 325, 330, in which the language was used to describe the purpose of the Sixth Amendment provision on confrontation in federal cases. It was transposed to *Snyder* solely to point out the distinction between a right of confrontation and a mere right of an accused to be present at his own trial.[39] The Court in *Snyder* specifically refrained from holding that there was any right of confrontation under the Fourteenth Amendment,[40] and clearly held to the contrary in *West* v. *Louisiana*, 194 U. S. 258, in which it was decided that the Federal Constitution did not preclude Louisiana from using affidavits on a criminal trial.

---

[38] " 'It was intended to prevent the conviction of the accused upon depositions or *ex parte* affidavits, and particularly to preserve the right of the accused to test the recollection of the witness in the exercise of the right of cross-examination.' " Petitioner Wissner erroneously assumes that "It" at the beginning of the sentence refers to the Fourteenth Amendment.

[39] *Snyder* involved a contention by a state convict that he was denied due process when the court prevented him from going along when the jury went to view the area where the crime was committed. Among the many bases for deciding against the defendant, the Court, through Mr. Justice Cardozo, pointed out that even if he had a federal right to confrontation (and the Court indicated he did not) his exclusion from a view would not offend it. Hence the use of the language quoted describing the nature of the right of confrontation.

[40] "For present purposes we assume that the privilege is reinforced by the Fourteenth Amendment, though this has not been squarely held. [Citing cases, one of which is *West* v. *Louisiana*.]" 291 U. S., at 106.

Basically, Wissner's objection to the introduction of these confessions is that as to him they are hearsay. The hearsay-evidence rule, with all its subtleties, anomalies and ramifications, will not be read into the Fourteenth Amendment. Cf. *West* v. *Louisiana, supra.*

Perhaps the methods adopted by the New York courts to protect Wissner against any disadvantage from the State's use of the Cooper and Stein confessions were not the most effective conceivable. But "its procedure does not run foul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar." *Snyder* v. *Massachusetts, supra,* at 105.

## VII.

Third-degree violence has been too often denounced by courts for anything useful to come out of mere repetition of invectives. It is a crime under state law and, in some circumstances, under federal law. *Screws* v. *United States,* 325 U. S. 91; *Koehler* v. *United States,* 189 F. 2d 711, 342 U. S. 852.

When the penalty is death, we, like state court judges, are tempted to strain the evidence and even, in close cases, the law in order to give a doubtfully condemned man another chance. But we cannot see the slightest justification for reading the Fourteenth Amendment to deny the State of New York the power to hold these defendants guilty on the record before us.[41]

We are not willing to discredit constitutional doctrines for protection of the innocent by making of them mere

---

[41] See Hall, Police and Law in a Democratic Society, 28 Ind. L. J. 133, 175–176; Inbau, The Confession Dilemma in the United States Supreme Court, 43 Ill. L. Rev. 442.

technical loopholes for the escape of the guilty. The petitioners have had fair trial and fair review. The people of the State are also entitled to due process of law.

*Affirmed.*

MR. JUSTICE BLACK, dissenting.

I concur in MR. JUSTICE DOUGLAS' opinion.

More constitutional safeguards go here—one, the right of a person to be free from arbitrary seizure, secret confinement and police bludgeoning to make him testify against himself in absence of relative, friend or counsel; another, the right of an accused to confront and cross-examine witnesses who swear he is guilty of crime. Tyrannies have always subjected life and liberty to such secret inquisitorial and oppressive practices. But in many cases, beginning at least as early as *Chambers* v. *Florida,* 309 U. S. 227, this Court set aside state convictions as violative of due process when based on confessions extracted by state police while suspects were held incommunicado. That line of cases is greatly weakened if not repudiated by today's sanction of the arbitrary seizure and secret questioning of the defendants here. State police wishing to seize and hold people incommunicado are now given a green light. Moreover, the Court actually holds (unnecessarily, I think) that states are free to deny defendants an opportunity to confront and cross-examine witnesses who testify against them, even in death cases. This also runs counter to what we have said due process guarantees an accused. *In re Oliver,* 333 U. S. 257, 273.\* Lastly, today's opinion takes this opportunity

_____

\*I do not understand that *West* v. *Louisiana,* 194 U. S. 258, held the contrary. It did hold at pp. 263–264 that a state could introduce depositions for the reason that the accused had "been once confronted with the witness and has had opportunity to cross-examine him . . . , and he is a non-resident and is permanently beyond the jurisdiction of the State . . . ."

to narrow the scope this Court has previously given the Fifth Amendment's guarantee that no person "shall be compelled in any criminal case to be a witness against himself." *Bram* v. *United States,* 168 U. S. 532, 544, held that this constitutional provision forbids federal officers to "browbeat" an accused, or to "push him into a corner, and to entrap him into fatal contradictions . . . ." The Court adds the *Bram* case to those it repudiates today, apparently agreeing with Professor Wigmore that Mr. Justice White's opinion there represents "the height of absurdity . . . ."

In short, the Court's holding and opinion break down barriers that have heretofore stood in the way of secret and arbitrary governmental action directed against persons suspected of crime or political unorthodoxy. My objection to such action by any governmental agent or agency has been set out in many opinions. See for illustration, *Chambers* v. *Florida, supra,* and *Ashcraft* v. *Tennessee,* 322 U. S. 143, 327 U. S. 274 (alleged confessions extracted without violence while suspects held incommunicado at the mercy of police officers); *In re Oliver,* 333 U. S. 257 (secret conviction based on incommunicado questioning by three judges where the accused had neither relative, friend nor counsel present); *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 142 (Attorney General's public condemnation of groups as treasonable and subversive based on secret information without notice or hearing); dissenting opinions, *Gallegos* v. *Nebraska,* 342 U. S. 55, 73 (arbitrary arrest, secret imprisonment and systematic questioning to obtain an alleged confession); *Carlson* v. *Landon,* 342 U. S. 524, 547 (Attorney General's denial of bail based on secret charges by secret informers without affording accused a hearing); *Ludecke* v. *Watkins,* 335 U. S. 160, 173 (Attorney General's judicially unreviewable banishment of an alien based on secret undisclosed information

and without a hearing); *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, 216 (Attorney General's judicially unreviewable imprisonment and denial of bail to an alien based on secret undisclosed information and without a hearing).

I join MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS in protesting the Court's action in these cases.

MR. JUSTICE FRANKFURTER, dissenting.

1. Of course the Fourteenth Amendment is not to be applied so as to turn this Court into a tribunal for revision of criminal convictions in the State courts. I have on more than one occasion expressed my strong belief that the requirements of due process do not hamper the States, beyond the narrow limits of imposing upon them standards of decency deeply felt and widely recognized in Anglo-American jurisdictions, either in penalizing conduct or in defining procedures appropriate for securing obedience to penal laws. Nor is this substantial autonomy of the States to be curtailed in capital cases.

2. It is common ground that the third degree—the colloquial term for subjecting an accused to police pressures in order to extract confessions—may reach a point where confessions, although not resulting from the application of physical force, are as a matter of human experience equally the results of coercion in any fair meaning of that term and therefore not "voluntary" in any relevant sense. Differences of view inevitably arise among judges in deciding when that point has been reached. Such differences are reflected in a long series of cases in this Court. An important factor, no doubt, influencing the different conclusions is the varying intensity of feeling on the part of different judges that coercive police methods not only may bring into question the trustworthiness of a confession but tend to brutalize habits of

feeling and action on the part of the police, thereby adversely affecting the moral tone of the community.

Of course, the most serious deference is to be accorded the conclusion reached by a State court that a confession was not coerced. See my concurring opinions in *Malinski* v. *New York,* 324 U. S. 401, 412; *Haley* v. *Ohio,* 332 U. S. 596, 601. But the duty of deference cannot be allowed imperceptibly to slide into an abdication by this Court of its obligation to ascertain whether, under the circumstances of a particular case, a confession represents not the candor of a guilty conscience, the need of an accused to unburden himself, but the means of release from the tightening of the psychological police screws. This issue must be decided without regard to the confirmation of details in the confession by reliable other evidence. The determination must not be influenced by an irrelevant feeling of certitude that the accused is guilty of the crime to which he confessed. Above all, it must not be influenced by knowledge, however it may have revealed itself, that the accused is a bad man with a long criminal record. All this, not out of tenderness for the accused but because we have reached a certain stage of civilization.

In the light of these considerations, I am compelled to conclude that the confessions here were the product of coercive police pressure. I cannot believe that these confessions, in view of the circumstances under which they were elicited, would be admitted in a criminal trial in England, or in the courts of Canada, Australia or India. I regret that the Court reaches another conclusion on the record, though I respect a conscientious interpretation of the record differing from mine.

3. But the Court goes beyond a mere evaluation of the facts of this record. It makes a needlessly broad ruling of law which overturns what I had assumed was

a settled principle of constitutional law. It does so *sua sponte*. The question was not raised and not argued and has emerged for the first time in the Court's opinion. Unless I am mistaken about the reach of the Court's opinion, and I profoundly hope that I am, the Court now holds that a criminal conviction sustained by the highest court of a State, and more especially one involving a sentence of death, is not to be reversed for a new trial, even though there entered into the conviction a coerced confession which in and of itself disregards the prohibition of the Due Process Clause of the Fourteenth Amendment. The Court now holds that it is not enough for a defendant to establish in this Court that he was deprived of a protection which the Constitution of the United States affords him; he must also prove that if the evidence unconstitutionally admitted were excised there would not be enough left to authorize the jury to find guilt.

An impressive body of opinion, never questioned by any decision or expression of this Court, has established a contrary principle. And this not only with reference to the admissibility of coerced confessions; the principle has governed other aspects of disregard of the requirements of the Fourteenth Amendment in State trials. I refer *inter alia* to cases of discrimination in the selection of personnel of a grand jury which found an indictment. We have reversed in such cases even though there was no error in the conduct of the trial itself.

4. It is painful to be compelled to say that the Court is taking a retrogressive step in the administration of criminal justice. I can only hope that it is a temporary, perhaps an *ad hoc,* deviation from a long course of decisions. By its change of direction the Court affords new inducement to police and prosecutors to employ the third degree, whose use the Wickersham Commission found "widespread" more than thirty years ago and

which it unsparingly condemned as "conduct . . . violative of the fundamental principles of constitutional liberty." IV Reports, National Commission on Law Observance and Enforcement, 1, 4, 6 (1931).*

The Wickersham Commission deemed it its duty "to lay the facts—the naked, ugly facts—of the existing abuses before the public," *id.*, at 6, in the hope of arousing public awareness, and thereby public condemnation, of such abuses. It surely is not self-deluding or boastful to believe that the series of cases in which this Court reversed convictions because of such abuses helped to educate public opinion and to arouse in prosecutors and police not only a wholesome fear but also a more conscientious feeling against resort to these lazy, brutal methods.

In addressing himself to law enforcement officials, Director J. Edgar Hoover of the Federal Bureau of Investigation has made these observations: "One of the quickest ways for any law enforcement officer to bring public disrepute upon himself, his organization and the

---

*The great weight to be attached to the findings of the Wickersham Commission is attested by the impressive experience represented by the members of that Commission. The Chairman, George W. Wickersham, was one of the most notable Attorneys General in the history of that office; Newton D. Baker, after a distinguished public career as Mayor of Cleveland and Secretary of War, became a recognized leader of our bar; William I. Grubb had a long career as one of the most esteemed judges on the federal bench; William S. Kenyon served with distinction first as a United States Senator and later as a federal judge; Monte M. Lemann contributed the balanced judgment derived from his recognized position at the bar; Frank L. Loesch, apart from his general qualifications, brought to the work of the Commission specialized competence in the administration of the criminal law; Paul J. McCormick was a United States district judge of conspicuous courage and hardheadedness; Dean Roscoe Pound's "Criminal Justice in America" is only one bit of evidence of the authority with which he speaks in this field.

entire profession is to be found guilty of a violation of civil rights. . . . Civil rights violations are all the more regrettable because they are so unnecessary. Professional standards in law enforcement provide for fighting crime with intelligence rather than force." (FBI Law Enforcement Bulletin, September, 1952, p. 1.) But if law officers learn that from now on they can coerce confessions without risk, since trial judges may admit such confessions provided only that, perhaps through the very process of extorting them, other evidence has been procured on which a conviction can be sustained, police in the future even more so than in the past will take the easy but ugly path of the third degree. I do not remotely suggest that any such result is contemplated by the Court. But it will not be the first time that results neither desired nor foreseen by an opinion have followed.

5. The matters which I have thus briefly stated cut so deep as to call for full exposition. Since promptness in the disposition of criminal cases is one of the most important factors for a civilized system of criminal justice, I must content myself now with this summary of my views without their elaboration.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

If the opinion of the Court means what it says, we are entering upon a new regime of constitutional law that should give every citizen pause. Heretofore constitutional rights have had greater dignity than rules of evidence. They have constituted guarantees that are inviolable. They have been a bulwark against over-zealous investigators, inhuman police, and unscrupulous prosecutors. They have placed a prohibition on practices which history showed were infamous. An officer

who indulged in the prohibited practices was acting lawlessly; and he could not in any way employ the products of his lawless activities against the citizen whose constitutional rights were infringed. But now it is said that if prejudice is not shown, if there was enough evidence to convict regardless of the invasion of the citizen's constitutional right, the judgment of conviction must stand and the defendant be sent to his death.

In taking that course the Court chooses a short cut which does violence to our constitutional scheme.

The denial of a right guaranteed to a defendant by the Constitution has never been treated by this Court as a matter of mere error in the proceedings below which, if not affecting substantial rights, might be disregarded.

*Powell* v. *Alabama,* 287 U. S. 45, established the rule that due process requires, in certain cases at least, that the state court appoint counsel to represent an indigent defendant. And the right to counsel includes the right to have counsel appointed in time to allow adequate preparation of the case. Neither in the *Powell* case nor in any of those which followed it has the weight of the evidence against the defendant been deemed relevant to the issue of the validity of the conviction. See *Smith* v. *O'Grady,* 312 U. S. 329; *Williams* v. *Kaiser,* 323 U. S. 471; *Tomkins* v. *Missouri,* 323 U. S. 485; *De Meerleer* v. *Michigan,* 329 U. S. 663. In *Hawk* v. *Olson,* 326 U. S. 271, at 278, we said:

> "Continuance may or may not have been useful to the accused, but the importance of the assistance of counsel in a serious criminal charge after arraignment is too large to permit speculation on its effect. . . .
>
> "Petitioner states a good cause of action when he alleges facts which support his contention that through denial of asserted constitutional rights he

has not had the kind of trial in a state court which the due process clause of the Fourteenth Amendment requires."

A similar rule prevails where the prosecution has made knowing use of perjured testimony to convict an accused. *Mooney* v. *Holohan,* 294 U. S. 103, 112; *Hysler* v. *Florida,* 315 U. S. 411; *Pyle* v. *Kansas,* 317 U. S. 213. It has never been thought necessary to attempt to weed the perjured testimony from the nonperjured for the purpose of determining the degree of prejudice which resulted.

In *In re Oliver,* 333 U. S. 257, we reversed a conviction for contempt based on a secret trial in which the defendant was denied reasonable notice of the charge against him, the opportunity to prepare a defense, the right to testify on his own behalf, the right to confront the witnesses against him and the right to be represented by counsel. No one, I suppose, would argue that such a conviction should be sustained merely because the record indicated quite conclusively that the defendant was guilty.

In *Moore* v. *Dempsey,* 261 U. S. 86, the Court dealt with a claim that the defendants had been convicted in a trial dominated by a mob. The defendants were charged with the murder of one Lee. They professed their innocence before the Court. Mr. Justice Holmes disposed of the assertion with these words:

"The petitioners say that Lee must have been killed by other whites, but that we leave on one side as what we have to deal with is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved."

Another illustration is the practice of discriminating against Negroes in the selection of juries. In none of the cases from *Neal* v. *Delaware,* 103 U. S. 370, and *Carter*

v. *Texas,* 177 U. S. 442, down to *Avery* v. *Georgia,* 345 U. S. 559, decided May 25, 1953, has the lack of a showing of actual prejudice precluded reversal. We indeed said in the *Avery* case that if the jury commissioners failed in their duty to use a nondiscriminatory method of selecting a jury, the "conviction must be reversed—no matter how strong the evidence of petitioner's guilt." 345 U. S., at 561. The reason is plain. The Constitution gives Negroes the right to be tried by juries drawn from the entire community, not hand-picked from the white people alone. Must a Negro now show that he suffered actual prejudice because none of his race served on the jury?

The requirement of counsel, the right of the accused to be confronted with the witnesses against him, his right to be given notice of the charge, his right to a fair and impartial tribunal, his right to a jury drawn from a fair cross-section of the community—none of these guarantees given by the Constitution is more precise than the prohibition against coerced confessions.

The rule now announced is, indeed, contrary to our prior decisions dealing with the effect of a coerced confession on a judgment of conviction. See *Malinski* v. *New York,* 324 U. S. 401, 404; *Stroble* v. *California,* 343 U. S. 181, 190; *Lyons* v. *Oklahoma,* 322 U. S. 596, 597; *Haley* v. *Ohio,* 332 U. S. 596, 599; and *Gallegos* v. *Nebraska,* 342 U. S. 55, 63.

The Court's characterization of these rulings as *dicta* is not correct. In the *Malinski* case a conviction was *reversed* even though other evidence might have supported the verdict. In the *Lyons* case (where the second confession was drawn in question) we noted (322 U. S., at 598) that a third confession was introduced without objection. Yet in spite of that fact we devoted a whole opinion to an analysis of whether the second confession

was voluntary. In the *Stroble* case the California Supreme Court had held that the use of a challenged confession had not deprived petitioner of due process, since it did not appear that the outcome of the trial would have been different if the confession had been excluded. 343 U. S., at 189. We disapproved that view and proceeded on the authority of our decisions in the *Malinski* and *Lyons* cases to examine the facts surrounding the confession to see if it was voluntary. *Id.*, at 190–191.

In each of those three cases we dealt with the merits of the claims that the confessions were coerced—a wholly unnecessary task had the rule as stated in the *Malinski* case not been controlling.

And with respect to the *Malinski* case, it should be noted that, despite a dissent by four Justices, no one took exception to the rule that the use of a coerced confession violates due process.

Perhaps the decision in the instant cases is premised on the view that due process prohibits the use of coerced confessions merely because of their inherent untrustworthiness. If so, that too is a radical departure from the rationale of our prior decisions. In *Lisenba* v. *California*, 314 U. S. 219, 236, Mr. Justice Roberts, speaking for the Court concerning the inadmissibility of coerced confessions, said:

> "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false."

As Mr. Justice Frankfurter states in his dissenting opinion, that rule is the product of a civilization which, by respecting the dignity even of the least worthy citizen, raises the stature of all of us and builds an atmosphere of trust and confidence in government.

The practice now sanctioned is a plain violation of the command of the Fifth Amendment, made applicable to the States by the Fourteenth (see *Brown* v. *Mississippi*, 297 U. S. 278, 286; *Chambers* v. *Florida*, 309 U. S. 227, 238), that no man can be compelled to testify against himself.* That should be the guide to our decisions until and unless the Fifth Amendment is itself amended to incorporate the rule the Court today announces.

---

*From the undisputed facts it seems clear that these confessions would be condemned if the constitutional school of thought which prevailed when *Haley* v. *Ohio*, 332 U. S. 596, *Watts* v. *Indiana*, 338 U. S. 49, *Turner* v. *Pennsylvania*, 338 U. S. 62, and *Harris* v. *South Carolina*, 338 U. S. 68, were decided still was the dominant one.