**Ellis CONEY, Jr., Appellant,**

v.

**Donald WYRICK, Appellee.**

**No. 75–1389.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1975.

Decided March 8, 1976.

As Amended March 26, 1976.

Thomas E. Douglass, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for appellant.

William F. Arnet, Asst. Atty. Gen., Jefferson City, Mo., for appellee; John C. Danforth, Atty. Gen., Jefferson City, Mo., on the brief.

Before HEANEY, ROSS and WEBSTER, Circuit Judges.

ROSS, Circuit Judge.

In this proceeding Ellis Coney, Jr. attacks his 1962 convictions for murder, robbery and rape in the state courts of Missouri, as a consequence of which he is currently serving three consecutive life terms. The federal district court denied relief under 28 U.S.C. § 2254. We reverse in part and remand because of involuntary guilty pleas to the charges of robbery and rape.

On the evening of December 5, 1962, Mrs. Betty Foster was found lying unconscious in a parking lot across from her place of employment in St. Louis. Medical examination disclosed that she had received a severe blow to the head and that she had been raped. She remained in a coma until her death on December 16, 1962. Shortly after Mrs. Foster was found the investigation focused on the residents of a house across the alley from the parking lot where the Coneys and another family lived.

At about 5 p. m. on December 7, 1962, two plainclothes detectives from the St. Louis police department went to Coney's home and told his mother that they wished to question and to administer a lie detector test to her 16 year old son, Ellis. Mrs. Coney gave them written permission to con-

duct the polygraph examination, and the accused was taken to the police station. At the time of his arrest Coney was of subnormal intelligence and illiterate,[1] and had been referred to juvenile court at least seven times between 1960 and his 1962 arrest.

The polygraph examination began about an hour after the arrest. Initially the accused denied any knowledge of the assault on Mrs. Foster, but in the opinion of the examiner, the machine indicated he was lying. While he was in the polygraph examining room, a detective entered with a pair of tweezers that had been found in Coney's pocket and asked where they came from. Shortly thereafter he admitted striking Mrs. Foster and taking the tweezers from her purse. This admission occurred around seven o'clock, about two hours after Coney was arrested at his home. He was then questioned by two officers for approximately 30 minutes, and he told them that he and another boy had assaulted and robbed the victim.

During this period of time one of the policemen asked Coney if he was hungry and Coney said he was. The officer left and returned with a sandwich and a soft drink. Coney was taken to another room with a television set in it, where he ate and watched the Red Skelton show. About eight o'clock, after he had eaten, Coney was interviewed by Mr. Koster, a prosecutor from the Circuit Attorney's office, who advised him of his right to remain silent and that anything he said could be used against him in court. Coney indicated he understood these warnings. Koster also explained that his job was to prosecute cases. Coney indicated he wished to make a statement and repeated his confession to the prosecutor.

Sometime between 8 and 9 p. m. several police officers and Koster took Coney to his home, stopping en route to pick up a police officer attached to the juvenile division. Mrs. Coney gave her permission for the police to search the house. In his mother's presence Coney showed the officers where he had hidden jewelry he had taken from Mrs. Foster's body, and also a butcher knife and a baseball bat used in the offense. While at the Coney home, Koster spoke with Mrs. Coney and explained her son's position. After no more than an hour at the home, the officers, Koster and the accused returned to the station. The prosecutor interviewed Coney for about another half hour, then they waited for a stenotypist to arrive.

An officer of the juvenile court spoke to Coney shortly after he had been brought back to police headquarters. The youth indicated he had not been mistreated in any way and he appeared to be in good physical condition. The juvenile court officer and the police officers decided to keep Coney at police headquarters for the night rather than at juvenile detention facilities.

Around 10 or 11 in the evening Koster began taking a formal confession from Coney which was recorded by the stenotypist. At the outset the accused was again advised of his right to remain silent and that anything he said could be used against him in court. Coney indicated he understood his rights and that no threats or promises had been made to him.

Coney stated that he and another boy had planned to rob and rape Mrs. Foster, whom Coney had previously seen parking her car near his house. Coney had punctured her tire with a butcher knife while she was at work. After she discovered the flat tire she got out of the car and bent over to look at it; Coney came up behind her and hit her over the head with a baseball bat. The two boys took two dollars and other items from Mrs. Foster's purse and dragged her body across the alley into Coney's yard. After they had each raped her and Coney had taken a ring and necklace, they dragged her back to the parking lot.

After the statement was completed, sometime around 11:30, the confession was transcribed, and no further interrogation was conducted. The reporter completed the transcription about one or two in the morning. Koster knew Coney couldn't read or

---

1. Since he has been in prison Coney has learned to read and write.

write, so he read each question to Coney and let him answer again to see that the written confession was correct. In some instances Koster read both the question and answer and Coney verified that they were correct. Corrections were initialed by the accused and he signed each page. The police officers initialed each page and signed the last page as witnesses.

Coney was kept at police headquarters on December 8 and 9; however, he was not questioned further about the assault and robbery of Mrs. Foster. He was taken before the juvenile court on December 12, where he was represented by counsel retained by his mother. The juvenile court determined he should be tried as an adult.

Coney was tried on the murder charge before a jury, in a trial lasting four days. The defendant pleaded insanity but was found guilty, and the jury assessed a punishment of life imprisonment on May 9, 1963. Judgment was entered accordingly.

On June 17, 1963, Coney withdrew not guilty pleas previously entered to the rape and robbery charges and pleaded guilty to those charges. He was sentenced to life imprisonment on each charge, the sentences to run consecutively, and both to run consecutive to the life sentence awarded after his murder trial. No motion for a new trial was filed on the murder charge, and no appeal was taken on any of the charges.

In 1968, Coney filed a collateral attack on these convictions in the Missouri courts. In 1969 a hearing was held in the Circuit Court of the City of St. Louis, and in 1970 the motion was denied. On appeal the Missouri Supreme Court remanded for a further hearing and findings on the voluntariness of Coney's confessions made on the day of his arrest. A further evidentiary hearing in accordance with the supreme court mandate was held in 1971, and in 1973 the circuit court again denied the motion.[2] This denial was appealed to the Missouri Supreme Court, which affirmed in *Coney v. State,* 491 S.W.2d 501 (Mo.1973). Habeas corpus relief was then sought in federal district court, which was denied without an evidentiary hearing.

In this court Coney contends 1) that his confessions were involuntary, 2) he was denied effective assistance of counsel, and 3) his pleas of guilty to the rape and robbery charges were involuntary.

### I. Voluntariness *vel non* of the confessions.

In this pre-*Miranda* case the admissibility of Coney's oral December 7 confessions and his formal written confession signed the morning of the 8th depends on whether, under the "totality of the circumstances," the confession was voluntary. *Gallegos v. Colorado,* 370 U.S. 49, 55, 82 S.Ct. 1209, 1213, 8 L.Ed.2d 325, 329 (1962); *Reck v. Pate,* 367 U.S. 433, 442, 81 S.Ct. 1541, 1547, 6 L.Ed.2d 948, 954 (1961). A confession is not voluntary if "the defendant's will was overborne at the time he confessed." *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922, 926 (1963); *Reck v. Pate, supra,* 367 U.S. at 440, 81 S.Ct. at 1546, 6 L.Ed.2d at 953. In making our determination in this case we must give careful consideration to the effect of Coney's youth and subnormal intelligence on the voluntariness of his confession. *Gallegos v. Colorado, supra,* 370 U.S. at

**2.** In his post-conviction proceeding Coney alleged that one officer threatened him and another "collared" him (not the interrogating officers, however.) According to his testimony he never made any statement to the police whatsoever. He intimated that a sleeping potion was placed in a sandwich or orange soda he was given which made him fall into a deep sleep. The officers then woke him up and told him they wanted him to sign some papers, but he said he was too tired and went back to sleep. The officers woke him repeatedly and told him he couldn't sleep until he signed. According to Coney, he couldn't hold the pen, and someone put the pen in his hand and guided it to sign his name. He said he did not see the confession because he was resting his head on the table, and it was never read to him. Testimony of the police officers, the prosecutor and the stenotypist contradicted the accused, and the state courts did not accept his testimony. Prior to this post-conviction proceedings Coney's mother had died. We accept the state court's findings of fact. *LaVallee v. Delle Rose,* 410 U.S. 690, 695, 93 S.Ct. 1203, 1205, 35 L.Ed.2d 637, 641 (1973); 28 U.S.C. § 2254(d).

52–53, 82 S.Ct. at 1211–1212, 8 L.Ed.2d at 327–328; *Reck v. Pate, supra,* 367 U.S. at 442, 81 S.Ct. at 1547, 6 L.Ed.2d at 954; *Culombe v. Connecticut,* 367 U.S. 568, 625, 639, 81 S.Ct. 1860, 1891, 1898, 6 L.Ed.2d 1037, 1070, 1078 (1961); *Haley v. Ohio,* 332 U.S. 596, 599–600, 68 S.Ct. 302, 303–304, 92 L.Ed. 224, 228 (1948). But even according those factors their proper weight we conclude that Coney's confessions were the product of his own free will and therefore they were admissible.

The police procedures used in questioning the accused were fair and humane. The periods of questioning were brief and during reasonable hours,[3] and petitioner was allowed to eat regular meals, rest and watch television. Therefore this case differs from *Haley v. Ohio, supra,* in which a 15 year old boy was questioned by relays of police from midnight until 5 a. m., at which time he confessed. In *Gallegos v. Colorado, supra,* a 14 year old was held incommunicado for five days and the police refused his mother's request to see him. Here, Coney's mother gave her permission for the polygraph examination, and between three and four hours later he was brought back home and was in his mother's presence. Mrs. Coney gave permission to search the house, and the Assistant Circuit Attorney explained her son's situation to her at that time. She did not seek to consult further with her son, nor did he ask to talk to her. Compare *Culombe v. Connecticut, supra,* 367 U.S. at 630–631, 81 S.Ct. at 1893–1894, 6 L.Ed.2d at 1073–1074, n. 93, where a mentally retarded defendant was relentlessly questioned for four days and his wife and family were "used" to induce him to confess, and *Haynes v. Washington,* 373 U.S. 503, 507–512, 83 S.Ct. 1336, 1339–1342, 10 L.Ed.2d 513, 517–520 (1963), where the de-

fendant was told his request to call his wife would not be honored until he confessed.

In this case we do not find lengthy, exhausting questioning, threats, implied or expressed, trickery, or overbearing police conduct of any kind. Although the youth should have been taken before the juvenile court earlier, we do not regard the failure to do so as dispositive. Instead, Coney confessed after he had been questioned by police for only a little over an hour, when he was confronted with the tweezers he had stolen from his victim's purse. Our conclusion is that "[t]he inward consciousness of having committed [a battery, a rape] and a robbery and of being confronted with evidence of guilt which [he] could neither deny nor explain seems enough to account for the confessions here." *Stein v. New York,* 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522, 1543 (1953). We are aware that overbearing police conduct would be likely to have an effect on a retarded boy of sixteen from a background of poverty; even one with an extensive juvenile record. However, we find no evidence of overbearing conduct here, and under the totality of the circumstances we are satisfied that Coney's confessions were voluntarily made.

*II. Effectiveness of counsel.*

▉▉▉ Coney maintains that he was denied effective assistance of counsel because trial defense counsel did not 1) object to the admission of the confessions on the ground that Coney was not taken before the juvenile court immediately after his arrest (V.A. M.S. § 211.061 (1959)) or 2) request a new trial or take a direct appeal.[4]

In order to show he was denied a fair trial because of incompetent defense counsel, a defendant must establish that his

---

3. Although the formal written confession was not signed until around 2 a. m., the questioning was actually completed much earlier in the evening. The accused was allowed to relax while the stenotypist transcribed the confession, and after checking it over, he signed it. The evidence showed that Coney was alert and cooperative during the periods of questioning and when the formal confession was signed.

4. Petitioner raises two other grounds we do not discuss. His argument that counsel was ineffective for failing to object to admission of the involuntary confessions is answered by our determination that the confessions were voluntary. Similarly, our conclusion *infra* that Coney's guilty pleas to the rape and robbery charges were not voluntary makes it unnecessary for us to determine whether counsel's advice relative to such pleas was defective.

representation was so ineffective as to constitute a mockery of justice, shocking to the conscience. *Franklin v. Wyrick,* 529 F.2d 79 (8th Cir. 1976); *DeBerry v. Wolff,* 513 F.2d 1336, 1340 (8th Cir. 1975); *Johnson v. United States,* 506 F.2d 640, 646, n. 9 (8th Cir. 1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 659 (1975). However, we have said:

> Stringent as the "mockery of justice" standard may seem, we have never intended it to be used as a shibboleth to avoid a searching evaluation of possible constitutional violations; nor has it been so used in this circuit. It was not intended that the "mockery of justice" standard be taken literally, but rather that it be employed as an embodiment of the principle that a petitioner must shoulder a heavy burden in proving unfairness.

*McQueen v. Swenson,* 498 F.2d 207, 214 (8th Cir. 1974).

Missouri law requires that when a youth under 17 is arrested he must be taken "immediately and directly" before the juvenile court. Mo.Ann.Stat. § 211.061 (1959). Coney argues that his counsel was ineffective because he failed to object to the admission of the accused's confessions which were taken while he was in police custody in violation of that statute. In effect he contends that counsel should have anticipated the holding in *State v. Arbeiter,* 408 S.W.2d 26 (Mo.1966) that statements of juveniles who were held in violation of section 211.061 were inadmissible. The Missouri Supreme Court apparently reached this question *sua sponte,* and based the decision on their supervisory power over the Missouri state courts. At Coney's trial, more than four years before *Arbeiter,* there was no Missouri precedent for excluding confessions on the basis of section 211.061, and counsel's failure to attempt to create one does not indicate ineffectiveness.

Coney points to his counsel's failure to request a new trial on the murder charge, without indicating any possible ground for the motion. He also suggests that his counsel's failure to take an appeal indicates ineffectiveness, but the record is devoid of any indication of what Coney's or his mother's wishes or instructions were with regard to an appeal. We agree with the Supreme Court of Missouri that "it is not outside the realm of reason that in counsel's judgment saving appellant from the death sentence was the best result possible under the brutal and shocking circumstances of this case and that he did not want to further expose his client to that possibility." *Coney v. State, supra,* 491 S.W.2d at 510.

Our review of the transcript of trial and the subsequent proceedings reveals that the accused's counsel was able, conscientious and well prepared; the insanity defense was well presented. In short, defense counsel did as well as could be expected with a difficult case, and possibly saved Coney's life. We will not indulge our hindsight to find inadequacy where none existed. *Franklin v. Wyrick, supra; United States v. Washington,* 529 F.2d 79 (8th Cir. 1975); *McQueen v. Swenson, supra,* 498 F.2d at 216.

### III. Voluntariness of guilty pleas.

Coney claims that his pleas of guilty to the charges of rape and robbery were not intelligently and voluntarily entered because he understood he would be given concurrent life sentences instead of the consecutive sentences he actually received. In the state's view, however, Coney has not exhausted his state remedies, and therefore he should be required to file a new motion for post-conviction relief in the state courts.

We first note that Coney's first petition for state relief was filed in 1968 and not disposed of until 1973. It is also interesting that while the state insists that Coney's proper remedy lies in the state courts, it admits that the state might well argue in any subsequent state proceeding that Coney is foreclosed from further state relief because he could have raised the issue in his first state proceeding. Mo.Rule Crim.P. 27.26(d). *See Smith v. Wolff,* 506 F.2d 556, 559 (8th Cir. 1974).

Finally, Coney has contended from the beginning of the state proceedings that his

guilty pleas were not intelligently and voluntarily entered because he was induced to enter them by assurances that his sentence would be considerably shorter than it turned out to be. Before the Missouri Supreme Court Coney's counsel argued in his reply brief, at 3:

> The representation was made to movant by his attorney that the life sentences were to be concurrent, and the Court, despite the knowledge that a representation was made to movant, made the life sentences consecutive.

The high court of the state held: "There was no evidence that the pleas were entered by mistake. * * * The trial court found and we affirm the finding that the pleas of guilty were made voluntarily, intelligently, and with the advice of competent counsel." *Coney v. State, supra,* 491 S.W.2d at 513. We conclude that Coney has effectively presented this issue to the Missouri courts, and the exhaustion doctrine should not be applied inflexibly to bar our consideration of it. *Rice v. Wolff,* 513 F.2d 1280, 1289–1291 (8th Cir.), *cert. granted,* 422 U.S. 1055, 95 S.Ct. 2677, 45 L.Ed.2d 707 (1975).

On June 17, 1963, after he had been convicted for murder and sentenced to life imprisonment, Coney appeared before a different judge than had presided over his murder trial. He withdrew his pleas of not guilty to rape and robbery, and the following transpired:

> [Circuit Attorney:] The State, as to Ellis Coney, will recommend in Cause 2–L, where he is charged with armed robbery, the robbery of Betty Foster of obtaining two dollars and some odd cents, a rosary and other personal things, a concurrent life term; and in Cause 3–L, the State will also recommend a concurrent life term to be served concurrent to that life term imposed in 2–L and already been imposed in 1–L, so that the recommendation as to Coney is that he will receive three concurrent life sentences. The jury that heard the evidence in the first case weighed the evidence very carefully in determining whether or not this defendant should receive capital punish-

ment, and it was determined by the jury to impose life imprisonment.

> The principal issue in this case happens to be the mental condition of this particular defendant. There was evidence in that trial, State's evidence, that his present IQ is that of 53; he is retarded, and he certainly doesn't have a well mentally developed mind and brain. These are considerations which we have weighed very carefully in recommending concurrent life terms to the Court, in light of his age and also his mental development, the crime, which I am sure is serious to the Court, being an educated one, we still recommend the concurrent life terms, which is consistent with the jury verdict which was received in Division 10 on the ninth of June, this year.

> THE COURT: As I understand it, you represented the defendant, Ellis Coney during the course of trial in Cause No. 1–L and under all the circumstances, you are recommending to your client that he enter a plea of guilty to the charges in Cause No. 2–L and 3–L and you are entering a plea of guilty to those charges on his behalf?

> [Defense Counsel:] Yes. I have apprised Ellis Coney of that fact that these life sentences are to be concurrent and it is his desire that he plead guilty and receive these sentences.

> THE COURT: Under the circumstances, the plea of guilty will be accepted and the recommendation of the life sentences will be followed.

> Is there any reason why sentence should not be pronounced at this time?

> [Defense Counsel:] There is none, your Honor.

> THE COURT: In Cause 2–L, on the charge of Robbery in the First Degree by Means of a Deadly and Dangerous Weapon, the defendant, Ellis Coney, Jr. will be sentenced to imprisonment in the State Penitentiary for the balance of his natural life. The sentence imposed herein to be consecutive to that heretofore imposed in Cause No. 1–L, subsequent to a trial by jury.

In Cause 3–L, is there any reason why sentence should not be pronounced at this time?

[Defense Counsel:] There is none, Your Honor.

THE COURT: Allocution having been granted and no legal cause shown why the defendant should not be sentenced at this time, he is hereby sentenced to a term of life imprisonment in the State Penitentiary for the rest of his natural life, such sentence in 3–L to run consecutive to the sentence heretofore imposed in Causes 1–L and 2–L. Defendant will be committed to the Department of Corrections for the service of such sentences and will be remanded to the custody of the Sheriff at this time for the carrying out of such commitment.

At the time of these pleas the determinative question was whether under the totality of the circumstances they were entered knowingly and voluntarily. *Brown v. Swenson,* 487 F.2d 1236, 1240 (8th Cir. 1973), *cert. denied,* 416 U.S. 944, 94 S.Ct. 1952, 40 L.Ed.2d 296 (1974). A plea of guilty induced by promises or made without full understanding of the consequences will not sustain a conviction. *See Machibroda v. United States,* 368 U.S. 487, 493, 82 S.Ct. 510, 513, 7 L.Ed.2d 473, 477 (1962); *Kercheval v. United States,* 274 U.S. 220, 223–224, 47 S.Ct. 582, 583, 71 L.Ed. 1009, 1012 (1927).

The record before us amply supports petitioner's contention that his pleas of guilty were not knowing and voluntary.[5] The prosecutor had offered to recommend concurrent life sentences if he would plead guilty. His counsel indicated Coney's understanding: "I have apprised Ellis Coney of that fact *that these life sentences are to be concurrent* and it is his desire that he plead guilty *and receive these sentences.*" It seems apparent that Coney was pleading guilty because of the assurances of concurrent terms given by the prosecutor and his own counsel. It also appears that the sentencing judge misunderstood the provisions of the plea bargain

which the accused had agreed to, since he stated he would accept the recommendation, but made the sentences consecutive despite the recommendation that they be concurrent.

Under the circumstances we find that the accused's pleas of guilty to the charges of rape and robbery were not voluntary. Unless the state trial court is willing to resentence Coney to concurrent sentences, he should be given the option of renegotiating a plea bargain and being resentenced pursuant to new pleas of guilty or entering not guilty pleas and standing trial.

Reversed in part and remanded for further proceedings consistent with this opinion.

---

5. Both the sentencing judge and Coney's trial defense counsel are now deceased. Therefore nothing could be added by remanding for an evidentiary hearing on this issue.