**Frederic D. JENNINGS, Petitioner-Appellant,**

v.

**J. Leland CASSCLES, Superintendent of Great Meadow Correctional Facility, Comstock, New York, Respondent-Appellee.**

**No. 233, Docket 77–2064.**

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1977.

Decided Nov. 10, 1977.

Kenneth E. De Mario, New York City (Pierce Gerety, Jr., Prisoners' Legal Services of New York, New York City, of counsel), for petitioner-appellant.

Mark C. Rutzick, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondent-appellee.

Before KAUFMAN, Chief Judge, SMITH and OAKES, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from judgment of the United States District Court for the Eastern District of New York, Mark A. Costantino, Judge, denying a petition for writ of habeas corpus attacking a New York State Court murder conviction based on a confession. We find no error and affirm the judgment.

About midnight, on June 4, 1970, 14-year-old Mary Carman disappeared while walking home from a concert at Wyandanch Junior High School in Wyandanch, New York. On August 21, 1970, the remains of a body, identified by dental records, jewelry and clothing as Mary Carman, were found in a wooded area at South 26th Street and Levey Boulevard, not far from the Carman home, by Schyler Carman, Mary's father. On the same day Detective Edward Halverson of the Homicide Squad of the Suffolk County Police Department was assigned to investigate Mary Carman's death. Between August 21 and 25, 1970 Halverson, a policeman for 9½ years and a detective for 5½ years, interviewed 30–35 people, including suspects. Halverson learned that clothes had been removed from the body and was informed that a substance in part of the clothing was in all likelihood spermatozoa. This information combined with the fact that the body was found in the woods suggested to Halverson that Mary Carman may have been raped. Halverson ascertained that Frederic Jennings, age twenty-two, of 72 South 25th Street, was being held in custody in Suffolk County Jail on two forcible rape charges. Since Jennings "fell in line . . . as one of the possible suspects" Halverson spoke with his superior, Captain Joseph Bierni, and then, on August 25, 1970 telephoned the jail and requested to interview Jennings. He was advised it was necessary for Jennings to sign a "permission slip," or form showing his willingness to speak with the detectives, and that he would be called if Jennings signed the slip. A short time later Halverson received a call from the jail and was informed that Jennings would see him the following day.

At 10:40 a.m. on August 26, 1970 Halverson, accompanied by Detective Richard Dean, met Jennings in one of several rooms near the main lobby of the jail. This room had a door and large windows, contained a table and three chairs. There was nothing to separate the officers and Jennings. Halverson and Dean indicated they were from the Homicide Squad and there to investigate the death of Mary Carman who they believed had been murdered and possibly raped not far from Jennings' home. The detectives also indicated, apparently at this time, that they felt there were "certain similarities" between the circumstances surrounding Mary Carman's death and allegations in the two rape charges filed against Jennings and that they would like to talk to him about them. Halverson talked at length with Jennings about his sexual problems. During this discussion Halverson inquired if Jennings had received treatment. Halverson also asserted that he felt Jennings was "responsible for the allegations that were made against him." The morning interview lasted until 11:30 a.m. at which time a break was taken so that Jennings could go to lunch.

About 1:05 p.m. Halverson and Dean again met with Jennings. They began to inquire about his family when Jennings asked them why it had taken them so long to find him. Asked what he meant, Jennings stated he had seen the body and then accurately described its location. Asked how he knew about the body, Jennings said a friend from the city had killed her and had taken him to see the body a week after the murder. Jennings then demonstrated how his friend had strangled her with a mugger-type hold. Asked for details, Jennings stated that on June 4, the evening of the concert, his friend had come to Jennings'·house, that about 9:30 p.m. Jennings left his house to visit his girlfriend, leaving his friend behind, that his friend met Jennings in front of his girlfriend's house about 11:30 p.m., and that Jennings drove his friend back to the city because he did not know how to drive. Jennings would not reveal his friend's name and gave only a general description of him. The afternoon interview lasted until 4:30 p.m.

After leaving the jail, Halverson interviewed Jennings' mother, who informed him that no one in the family knew of a friend who had visited Jennings from the city, and Jennings' girlfriend, who said that she knew nothing of his friend from the city and that she had not been with Jennings on the evening of June 4, 1970. On the basis of the interviews and Jennings' precise description of the body's location, Halverson decided that Jennings "had not told me the truth in regard to his friend and I felt he was a very good suspect in the murder of Mary Eloise Carman."

The next day, August 27, 1970, Halverson and Dean returned to the jail. Jennings signed a second permission slip and met with the detectives about 10:40 a.m. in another of the rooms near the main lobby. Halverson indicated that he would have to advise Jennings of his constitutional rights at this point. Jennings replied that he knew all about his rights, that he had learned them "at the First Precinct." Jennings was then advised fully of his constitutional rights. Asked if he wished to waive these rights, Jennings responded that he did, that he didn't do anything to the girl, that his friend did and that he would tell them about it. Asked if he knew Mary Carman, Jennings stated he knew about the body in the woods a couple of days after the concert. When told by Halverson they thought it would have been natural to ask his friend about how the girl died and the circumstances surrounding her death, Jennings replied he knew everything that happened. Asked to tell them all he knew, Jennings related that his friend saw Mary Carman on Jamaica Avenue walking toward 21st Street and again on Levey Boulevard going toward 26th Street, grabbed her around the neck in a mugger's hold, dragged her into the woods, punched her in the stomach to bring her to the ground, and after finding out her rings were cheap, "he did his thing." Afterward, Jennings continued, his friend met Jennings and then drove back to the city. Asked why his friend might have killed the girl, Jennings said the only thing might be that she recognized him. Halverson pointed out inconsistencies in Jennings' accounts and told him that his girlfriend denied that he had been at her house the evening of the concert. Jennings became agitated and said that if he got his girlfriend by the neck she would say he had been there. Halverson told Jennings to calm down. He then told him that he did not believe he had this friend and that Jennings himself had done the things that he had recounted. Jennings then admitted that he had done the things he had ascribed to his friend and acknowledged that he had intercourse with Mary Carman. The interview ended about noon.

No notes were taken at either interview. Each day's conversation was summarized by Halverson on police department forms. No signed statement resulted from the interrogation. A pretrial suppression hearing, mandated by *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y. S.2d 838, 204 N.E.2d 179 (1965), was held on the admissibility of Jennings' statements to Halverson and Dean. Jennings declined the opportunity to testify. Jennings' comments on August 26, 1970 were ruled inadmissible because he was not advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). His statements of August 27, 1970 were ruled admissible because Jennings had been properly advised and had, before he spoke, knowingly waived his rights to counsel and to remain silent. The trial judge declined to suppress Jennings' comments of August 27, 1970 simply because those of August 26, 1970 had been ruled inadmissible. Jennings' counsel excepted.

Jennings was tried for murder before a jury in the County Court, Suffolk County. Based upon his confession and other statements on August 27, 1970 and evidence concerning the manner and circumstances of Mary Carman's death, Jennings was convicted. On August 5, 1971 Jennings was sentenced to 25 years to life in prison. The sentence was to run concurrently with two prior 15-year indeterminate sentences for forcible rape.

The Appellate Division, Second Department affirmed. 40 A.D.2d 357, 340 N.Y. S.2d 25 (1973). The court noted not only that "[n]othing in this record remotely suggests that any of the statements made on either occasion were made involuntarily" but also that "[t]here is no showing that the earlier admission so dominated the defendant's mind on the later occasion that he was compelled to speak." *Id.* at 362–3, 340 N.Y. S.2d at 30. The New York Court of Appeals affirmed on the opinion of the Appellate Division. 33 N.Y.2d 880, 352 N.Y.S.2d 444, 307 N.E.2d 561 (1973).

Jennings then filed a *pro se* petition for a writ of habeas corpus. This petition was denied on August 14, 1974. With benefit of counsel, Jennings filed a second petition, alleging his confession had been involuntary and was "fruit of the poisonous tree." On November 8, 1976 the district court denied the second petition. 424 F.Supp. 280 (E.D. N.Y.1976). The court noted that 28 U.S.C. § 2254(d) mandates that federal courts give deference to state court determinations on voluntariness and found that even if it were proper in the instant case to review the state court's finding as to voluntariness the finding would not be disturbed. As to Jennings' second claim, the district court declined to apply the "fruit of the poisonous tree" test and stated that even if it were applicable that Jennings' voluntary repetition of his first day statements "constituted an intervening act of free will sufficient to purge the primary taint so as to render the confession admissible." *Id.* at 285. Final judgment was entered on November 9, 1976.

A certificate of probable cause was issued on March 31, 1977 and Jennings filed a notice of appeal on May 23, 1977.

Jennings seeks federal habeas corpus relief on the ground that his fifth amendment rights have been violated.[1] The fifth amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." If Jennings' confession on August 27, 1970 was voluntary it was properly admissible as evidence. If it was forced or compelled, it was inadmissible.

The test for voluntariness "is whether an examination of all the circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will [to] resist and bring about confessions not freely self-determined. . . . .' *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). . . . " *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir. 1974), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974), *quoting United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir. 1967), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967). Cf. *Tanner v. Vincent*, 541 F.2d 932, 936 (2d Cir. 1976). At the suppression hearing the trial judge found that Jennings "voluntarily and from his free will spoke to the police concerning this case and that at no time was he struck, threatened, coerced or promised anything." In affirming Jennings' conviction, the Appellate Division, as noted above, found that "[n]othing in this record remotely suggests that any of the statements made on either occasion were made involuntarily." The Court of Appeals affirmed on the opinion of the Appellate Division. The District Court concluded that

[i]n this case, there is no evidence of any physical abuse of the defendant. Nor is there evidence of the type of mental or physical coercion which had rendered confessions involuntary in other cases [cita-

1. On the record of this case a new evidentiary hearing in a federal court was not required, cf. *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), nor indeed has Jennings requested one. Moreover, Jennings has not established, nor does the record suggest, nor does it otherwise appear, that there is any basis for not presuming the state court's factual determinations to have been correct. Cf. 28

U.S.C. § 2254(d); see also *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1972), *United States ex rel. Lewis v. Henderson*, 520 F.2d 896, 902–04 (2d Cir. 1975), *United States ex rel. Johnson v. Department of Correctional Services*, 461 F.2d 956 (2d Cir. 1972). The district court correctly accepted the factual determination of the state court.

tions omitted]. Indeed, there was far less pressure on the defendant to speak in this case than in others in which the confessions were held to be voluntary [citations omitted].

On appeal Jennings has not seriously pressed the claim that his confession was involuntary.

■ Jennings' second claim on which he primarily relies, is that his confession should be ruled inadmissible because it was "tainted" or "fruit of the poisonous tree," because he did not receive *Miranda* warnings on August 26. In affirming Jennings' conviction, the Appellate Division, as noted above, concluded "[t]here is no showing that the earlier admission so dominated the defendant's mind on the later occasion that he was compelled to speak." We cannot fault this conclusion in the light of Jennings'

experience, his statement that he was familiar with his rights from warnings given "at the First Precinct" presumably following his recent arrest on rape charges,[2] and the lack of any indication of physical or other threats or coercion.[3] While it is true that Jennings committed himself to his story before receiving the proper warnings, we do not regard this as dispositive.[4]

■ On appeal, Jennings revives the claim, made at the state suppression hearing, that he did not knowingly and intelligently waive his right to remain silent and his right to counsel. This claim was not asserted in the District Court and first appears here only in petitioner's reply brief. Since this "point was not raised in the petition for the writ of habeas corpus, it is not properly before us," *United States ex rel. Springle v. Follette*, 435 F.2d 1380, 1384 (2d

2. See *infra*, n. 5.

3. Halverson testified as follows:
Q. All right. Now, officer, you spoke to the defendant on two days; is that right?
A. That is right.
Q. At any time, did you ever strike him?
A. No.
Q. Did Dean ever strike him?
A. No sir.
Q. Was any type of violence used on his person?
A. No violence at all.
Q. All right. Officer, you've testified basically in conversational tones; what were the tones or the level of the conversation during this entire two day period?
A. On my part I would say it was very much the same as I am talking right now.

    .    .    .    .    .
Q. Officer, did you make any promises to this defendant?
A. No, I didn't.
Transcript of Suppression Hearing, at 238–39.

4. The record shows that Jennings regarded his story as exculpatory after he was given the *Miranda* warnings, see *infra* n. 5, and suggests that he would have waived the warnings and told his story on the first day even if he had received them. Detective Halverson testified as follows:
Q. And did there come a time when this interview resumed?
A. Yes, at approximately 1:05 that afternoon we returned from lunch and Frederick Jennings returned to the same interview room and we commenced somewhere where we left off.
Q. All right. And what was said at that time?

A. At that time I—we spoke again. I asked him questions about his family background, he stated that he did not get along very well with his father and he stated he did get along fairly well with his mother and he said that he got along best with his sister and after a short time, why, he said, why did it take so long for you to get to me? And I said, well, why do you say that? He says, well, I thought you'd come to see me a long time ago. I said, why would you expect us to see you at all? And he says, well, I saw the body. So I said, where did you see the body? At at [sic] that time we were sitting at a desk and he with the corner of the desk, he drew with his finger, he indicated where Levey Boulevard, first of all, he said, this is South 26th Street and I says, right. And he said, now, this other street that comes here and he had a little difficulty pronouncing it, and I said, do you mean Levey Boulevard? And he said, yes, Levey Boulevard. He says, right where it comes together. He says, right at a corner.

    .    .    .    .    .
Q. All right. What was said then, officer?
A. I said, I requested him, how did you come about knowing about the body? And he says, my friend killed her, and I said, well, how did your friend kill her? And he said, you mean, you don't know? And I said, no, we don't know. And he says, by strangulation. I says, well, how by strangulation? And he said, like this. And at that time he took his arm and he made a mugger's type strangle hold.
Transcript of Suppression Hearing, at 212–14.

Cir.), *cert. denied sub nom. Springle v. Zelker*, 401 U.S. 980, 91 S.Ct. 1214, 28 L.Ed.2d 331 (1970). See also *Ross v. LaVallee*, 341 F.2d 823, 824 n. 1 (2d Cir.), *cert. denied sub nom. Ross v. New York*, 382 U.S. 867, 86 S.Ct. 137, 15 L.Ed.2d 105 (1965). Under the circumstances, we decline to rule on an eleventh-hour claim.[5]

We find no error in the determination that Jennings' confession was voluntary and admissible, and Jennings' claim that he did not knowingly and intelligently waive his rights is not properly before us.

We find no reason to disturb the District Court's judgment and we affirm.

---

[5]. Although an appellate court may consider a point not raised below "to prevent a manifest miscarriage of justice," *Lester v. Wilson*, 363 F.2d 824 (9th Cir. 1966), we find no such situation here. Were we to entertain Jennings' claim it would be denied. The determination, made at the suppression hearing, that Jennings' "intelligently and knowingly waived his constitutional rights to counsel and to remain silent," (Transcript of Suppression Hearing at 346), is fully supported by the record. Detective Halverson testified as follows:

Q. Okay. And, officer, when you first saw Jennings on the 27th, what did he say to you and what did you say to him?

A. When I returned on the 27th I told him that at this point I would have to advise him of his constitutional rights before I have any further conversation with him. At that time he told me that he knew all about his rights, he learned about his rights at the First Precinct, and I says, well, then you realize that again I'm going to have to advise you of your constitutional rights, and I advised him that if he would, as I read over these rights, to him, if he understood them when I asked them, if he understood them, would he say I do understand them. If he doesn't understand them, say no, I don't understand them and I'll explain them further. At that time, I stated to him that you have the right to remain silent, anything you say can and will be held against you in a Court of law, and at that point I stopped and I said, do you understand that? And he said, yes, I do. I advised him, you have the right to an attorney and he can be present with you now before any questioning if you want one. I says, do you understand that? And he says, yes, I do. I says, if you cannot afford to hire an attorney, or a lawyer,—I'm sorry, I used the word lawyer in each one of these sentences. I said, if you cannot afford to hire a lawyer, one will be appointed to represent you at no cost right now before any questioning if you wish one. Do you understand that? And he says, yes, I do. I says, now, do you understand all of these rights that I have just explained to you, and he says, yes, I do. I says, do you want a lawyer at this time? And he says, no, I don't need a lawyer and I don't want one. I said, now having these rights in mind, do you wish to waive these rights at this time and speak to myself and Detective Dean in regard to the death of Mary Eloise Carman, and he says, yeah, I didn't do anything to that girl. My friend did it and I'll speak to you about it. I've got nothing to hide.

Transcript of Suppression Hearing at 225-26.