Walter WOLFRATH, Petitioner-Appellee,

v.

J. Edwin LaVALLEE, Superintendent, Clinton Correctional Facility, Respondent-Appellant.

No. 609, Docket 77–2085.

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1978.

Decided May 9, 1978.

Martin E. Gotkin, New York City, for petitioner-appellee.

Allan S. Moller, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondent-appellant.

Before MOORE, SMITH and MANSFIELD, Circuit Judges.

MOORE, Circuit Judge:

In 1968, Petitioner Walter Wolfrath was convicted in the New York courts for the robbery of the Don-Lee Studios in New York City in 1966.[1] Aside from a positive in-court identification by the owners of Don-Lee, one of whom had had the opportu- nity to observe the robber, face-to-face, for about six to eight minutes, Wolfrath's two confessions may have contributed to the verdict. The first of those confessions was made to a detective, who at the time was without knowledge of the Don-Lee incident, while Wolfrath was in a hospital recovering from surgery to repair a bullet wound sustained in an unrelated robbery attempt. The second confession, substantially the same as the first, was made the next day at a second hospital, to the detective who was working on the Don-Lee case. Both confessions were the subject of a state pretrial *Huntley* hearing to determine voluntariness, *see People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), and both confessions were admitted at trial. Wolfrath's convictions were affirmed on appeal. *People v. Wolfrath*, 32 A.D.2d 742, 301 N.Y.S.2d 408 (1st Dept.1969), *aff'd*, 26 N.Y.2d 943, 310 N.Y.S.2d 505, 258 N.E.2d 919 (1970).

In 1973, Wolfrath petitioned for habeas corpus relief on the grounds, *inter alia*, that his confessions had been involuntary and that his pretrial identification, also litigated in the state court prior to trial, had been unconstitutional, thus rendering inadmissible the in-court identification. Both contentions were rejected by the district court[2] on the ground that, upon an examination of the minutes of the state court hearings, the statutory presumption of correctness of the state court determinations was not overcome so as to require a hearing, 28 U.S.C. § 2254(d); *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). After Wolfrath's request for a certificate of probable cause pursuant to 28 U.S.C. § 2253 was denied by the district court, Wolfrath applied to this court for the certificate. By order dated September 3, 1975, a panel of this court denied the application but re-

---

1. Wolfrath was convicted on two counts of robbery in the first degree, one count of burglary in the third degree, and one count of possession of a loaded firearm, a felony. He was sentenced as a fourth felony offender for a term of sixteen years to life. Wolfrath, at first, had pleaded guilty to the crime of robbery in the third degree in satisfaction of the indict- ment, but he retained the right to withdraw the plea if it developed that he was a fourth offender. When the state sought a sentence on that ground, Wolfrath did withdraw his plea, and the trial was held.

2. The petition was originally brought in the Northern District of New York.

manded to the district court for a hearing solely on the issue of the involuntary confession claim.[3] After two rounds of hearings were held, Judge Duffy, considering only the first of the two confessions, found that the statement had been involuntary and should not have been admitted and, further, that the error was not harmless. He ordered that the Writ should issue unless a new trial were granted by the state. We reverse.

## I. THE CIRCUMSTANCES OF THE CONFESSIONS

The circumstances surrounding the confessions were established both at Wolfrath's *Huntley* hearing and at his trial largely by the uncontradicted testimony of the patrolman and the detectives who interviewed Wolfrath: Early in the morning (about 1:30 a. m.) on November 5, 1966, three days after the Don-Lee robbery was committed, Wolfrath checked into the emergency room at St. Vincent's Hospital in New York City. He had a gunshot wound in his forearm. Patrolman James Emburey testified that, at about 1:40 that morning he proceeded to St. Vincent's to conduct an investigation into the circumstances of the bullet wound. When he arrived, he inquired of Wolfrath about the events causing the injury. Wolfrath responded that he had been the victim of an attempted robbery—that when he tried to fight off his assailant, the gun had gone off. Emburey noted that at the time of this interview, Wolfrath was not in custody, and that his condition appeared "normal" considering that he had a bullet wound.

Later that morning, Emburey and a partner were on patrol in an area near the site where Wolfrath had claimed he had been assailed. For reasons that were not brought forth in the record, the officers stopped a vehicle; Emburey's partner apparently spotted a revolver in the car, and arrested the occupants, Robert and Laura Wyatt. Near the police station, Robert Wyatt tossed a slip of paper on the sidewalk. Although the content of the paper was never permitted to be revealed at the trial, it appears that Wolfrath's name was on it, and that Emburey learned through the Wyatts that Wolfrath had not been the *victim* of a robbery attempt, as he had claimed, but had rather been injured while attempting a crime, along with Robert Wyatt. One Detective Spano was apparently advised of this new development.

According to Spano's testimony, he proceeded to St. Vincent's to investigate further, taking the Wyatts, who were then in custody, and the revolver seized from the Wyatts, with him. Spano arrived at about 5:00 a. m.

While the Wyatts waited near the door to Wolfrath's room, the detective advised Wolfrath, who was found "half sitting up, half lying down" in bed (Transcript of pretrial hearings, at 66, Joint Appendix at 78), of his *Miranda* rights, since he was now suspected of having given false information about the wound. Spano then confronted Wolfrath with the fact that the Wyatts were at the hospital. According to Spano's testimony, when told that the true story of the gunshot wound had emerged, Wolfrath stated: "Yes, I was telling a lie." (Tr. at 58, JA at 70). Wolfrath then divulged in some detail how and where his injury had been incurred, namely, when he and Robert Wyatt "were going to do a stick-up to get some money" (Tr. at 59, 60, JA at 71, 72), and acknowledged that the gun now in Spano's possession was that used in the crime, in the course of which he had been accidentally shot.

After admitting the previous false story, concocted to conceal the crime, Wolfrath, according to Spano, then volunteered:

[Spano, quoting Wolfrath]:

" 'Look, while I am telling you this, there there is something else I have to tell you.'

Q: Did you ask him or did he say this to you?

---

3. The case was transferred to the Southern District of New York for proceedings on the hearing required by this court.

A: [Spano]: He was telling me, sir. He said that a few days previous he had done a stick-up and that he stuck up a beauty salon.

Q: Now before you go any further, officer, at that time, on that date, did you have any knowledge whatsoever of a stick-up of a beauty salon?

A: No." (Tr. at 60, JA at 72).

Spano then asked Wolfrath to "describe the place that he is supposed to have stuck up." (Tr. at 60, JA at 72). According to Spano, Wolfrath was able to describe the general vicinity—i. e., "somewhere within a few blocks' radius of the Hilton Hotel". (*Id.*) Spano further asked Wolfrath whether he knew which precinct the area was in, and Wolfrath responded "No". (*Id.*) Wolfrath was, however, able to tell Spano that " '[i]t is a few blocks from the Hilton Hotel.' He said you had to go up on an elevator". (Tr. at 61, JA at 73). Wolfrath *did* recall that the establishment he had robbed was a beauty salon, but he was not able to tell Spano which floor it was on. (*Id.*) Further details were given by Wolfrath: he knew that he had used the same gun that Spano now had (which was also used in the crime during which Wolfrath had sustained the wound); he recalled a "man and woman" at the beauty salon; and he placed Robert Wyatt "downstairs" at the time of the robbery. (*Id.*) (At the federal hearing below, Wolfrath testified that he knew Wyatt was at the hospital at the time these statements were made. He further testified that Wyatt was brought into the room "and I tried to swing at him". (JA at 53, 56, Transcript of Hearing of August 5, 1976, at 4, 7)).

When Spano was examined about Wolfrath's condition, his testimony was that Wolfrath had appeared "calm and responsive" at the time he spontaneously admitted the Don-Lee crime, and that Wolfrath's replies had been coherent. Spano denied knowledge of the operation to remove the bullet, which had occurred probably about an hour before he arrived at St. Vincent's, and he was unaware of any medication that Wolfrath may have been given, although the detective did notice that Wolfrath's arm was in a sling. Spano claimed that Wolfrath told him, in response to a question, that he felt "fine", and that Wolfrath's voice, with which Spano became more familiar after the initial conversation, seemed to be "normal".[4]

Apparently, after Spano learned of the previously unknown robbery, he relayed the information to Detective Hanford who had been assigned to the Don-Lee case. Hanford heard a second confession, which was also litigated at the pretrial hearing but was not considered at the federal hearing. According to Hanford's testimony, he went to see Wolfrath at Bellevue Hospital, where the defendant had been transferred on November 6, 1966. Hanford arranged for the victims of the Don-Lee robbery, the Sehnerts, to meet him at Bellevue in order to identify the possible perpetrator of the crime.[5] Hanford left the Sehnerts near the elevators and alone approached Wolfrath, who was seated in a wheelchair in the corridor. Again, *Miranda* rights were read to Wolfrath, who was now the subject of the Don-Lee investigation, and, as he had done at St. Vincent's, Wolfrath answered "Yes" when asked whether he understood each recitation. When Hanford asked whether Wolfrath was willing to speak without an attorney, Wolfrath stated that he "want[ed] to tell [Hanford] what happened". (Tr. at 14). Hanford then explained that he was investigating the Don-Lee robbery and that he understood that Wolfrath had admitted

---

**4.** Spano testified that he spoke to Wolfrath several times after the occurrences at St. Vincent's, to wit, after the criminal proceedings had begun. (Tr. of State pretrial hearing, at 71, JA at 83).

**5.** The circumstances of the identification were *extensively* litigated at the State pretrial hearing. The trial judge permitted the in-court identification by Mrs. Sehnert because she had had the opportunity to observe the robber, face-to-face, for some six to eight minutes during the crime. Since the previous order of this court remanding the case for a hearing was limited to the confession question, the identification claim is not before us; no review of that claim was deemed necessary.

having done it. According to Hanford, Wolfrath said: " 'That's right.' . . . 'I did it.' . . . 'I was with a Robert Wyatt'." (Tr. of State hearing at 14). Wyatt, said Wolfrath, was a former employee of Don-Lee, and "had set the job up". (Tr. at 15). "And he said", according to Hanford, " 'the reason I am telling you this is I want to see him get caught, because he stuck his wife with the gun charge and he has gotten away scot-free'." (Tr. at 15).

Upon cross-examination, Hanford stated that he did not know whether Wolfrath had been under sedation or any medication during the conversation, nor whether the defendant had a psychiatric background. He did not hear Wolfrath complain of any pain. Rather, Wolfrath seemed "alert and responsive", (Tr. at 42, 45–46).

Hanford then told of another confession made by Wolfrath in the presence of the Sehnerts after they were brought to view the suspect. Marion Sehnert also testified that Wolfrath admitted his guilt in her presence, and that the defendant did not appear to be in pain at the time. (Tr. at 103).

Wolfrath's case at the State pretrial hearing consisted primarily of cross-examination of the People's witnesses. Defense counsel also offered the hospital records from Wolfrath's St. Vincent's and Bellevue stays. (Tr. at 180). Counsel read from that portion of the hospital record which indicated that certain drugs had been ordered for Wolfrath while at St. Vincent's, and asked for a stipulation that the entries were correct. The prosecutor, while conceding that the records indicated that some drugs had been *ordered*, as evidenced by entries under a column labelled "Ord.", refused to stipulate that drugs were in fact administered, and he expressly declined to permit a stipulation "as to what effect it had if it was administered". (Tr. at 181, 185).

The defense presented no further evidence on that point except for reading additional entries in the hospital records, which were admitted into evidence, stating that Wolfrath's arm had been kept elevated, and that there was an order to "check color and swelling, left hand". (Tr. at 185). With that, the defense rested, and argued to the judge that Wolfrath's statements should be suppressed because he had not "been fully apprized of his constitutional rights . . [as] mandated under . . . Miranda." (Tr. at 186). The gist of the argument was that, because the rights had been read only once, at the beginning of each interview by the detectives, and not repeated again, there was no "waiver", and the statements should not be admissible because of the improper behavior on the part of the officers. (Tr. at 188–89).

The trial judge concluded that there had been a valid waiver; there had been no evidence that the defendant had not understood the rights, and the evidence was uncontradicted that the rights had been read to Wolfrath.

At the trial, an insanity defense was raised. Apparently, Wolfrath had been a long-time alcoholic, and defense counsel suggested that tragic occurrences during the defendant's life, exacerbated by the drinking problem, contributed to his inability to form a criminal intent. As at the State pretrial hearing, Emburey testified that Wolfrath seemed alert and responsive (Tr. at 318), and Spano did the same. (Tr. at 353). And again, the hospital records were offered (Tr. at 463), with the same stipulation by the prosecutor—that perhaps drugs had been ordered, but there was no indication that they were in fact administered and, if so, whether there was any significant effect on Wolfrath at the time. (Tr. at 464).

The defense rested without submitting any further proof on these issues, though the hospital records were read into the record, along with the prosecutor's stipulation. Again, the gist of the defendant's argument to the jury (and later to the judge in his post-trial motions), was that the detectives had not adequately inquired of Wolfrath as to whether he understood the *Miranda* rights read to him (*see* Tr. at 489–90), and that defendant's statements had been involuntary. Against this argument, the prose-

cutor stressed that two witnesses had testified that Wolfrath had been advised of his rights, had wished to speak about his participation in the crime, and had been coherent, responsive, and alert. The hospital records only gave a basis for speculation, and there was no evidence to support the unproven facts of the administration of drugs or the effect on the patient.

In the court's charge, the judge called attention to the stipulation concerning the hospital records and properly instructed the jury that it must find the confessions voluntary before considering the weight to be given them. Apparently the jury agreed that the statements were voluntary and a verdict of guilty was returned.

## II. THE FEDERAL HEARINGS

Pursuant to the previous remand by this court, Judge Duffy conducted a hearing solely on Wolfrath's voluntariness claim. Before the court were the State hearing and trial transcripts as well as the hospital records. On August 5, 1976, Wolfrath was brought to court to testify.

Not surprisingly, Wolfrath could not recall all the details of the events that occurred ten years earlier. However, to a great extent, his testimony corroborated the uncontradicted evidence at the State proceedings: Wolfrath did not recall whether he had been given drugs (JA at 52), but he did recall having told the false story about the bullet wound to Patrolman Emburey (JA at 55). He testified that he remembered having been taken to the operating room and awakening after his operation to the sound of a TV and to the sight of his mother standing in the room (JA at 53). He also remembered that he had tried to "take a swing" at Robert Wyatt (JA at 53, 56), and that Detective Spano had not asked any questions whatsoever about the Don-Lee robbery or about the gun seized from the Wyatts which was then in Spano's possession. (See JA at 60–61). Wolfrath said: "He [Spano] didn't question me, he brought my partner in". (JA at 58).

At this initial hearing, again no medical evidence was presented on the question of the administration of drugs or on the effect on Wolfrath of any drugs he might have received. Despite defense counsel's apparent belief that such facts—if they existed—would not have aided his client's cause, Judge Duffy sua sponte decided that such evidence was necessary in order to determine the voluntariness claim since, as he stated, "[t]he voluntariness of a confession given under the influence of the indicated dosage is certainly subject to serious challenge. See Jackson v. Denno, 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908] (1964)." (Opinion of Judge Duffy [dated June 18, 1977] after first hearing on application for habeas corpus, JA at 48).

Judge Duffy also noted that the State had argued that a federal hearing should not have been held on the voluntariness claim. He answered that the argument was foreclosed by reason of the prior remand by this court for a hearing. This, of course, is true. However, it appears that the prior panel may not have been fully familiar with the fact that the need for evidence of the effect of the drug, if any, on Wolfrath, had been made fully apparent to defense counsel. Had the omission been made clear, it is likely that no federal hearing would have been ordered under the "inexcusable default" exception in Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), which otherwise mandates a federal hearing on the ground that "material facts were not adequately developed at the state-court hearing". Id. at 313, 83 S.Ct. at 757, now codified in 28 U.S.C. § 2254(d)(3).

In any event, on July 21, 1977, the second federal hearing was held, at which the sole witness was one Dr. Charles P. Felton. Dr. Felton had never seen Wolfrath before; he had not been at St. Vincent's when Wolfrath spoke to Spano; nor did he testify to a familiarity with St. Vincent's procedures. This expert testified only on the basis of his review of the medical records and the transcripts of the prior hearings. Based on the notations in the St. Vincent's record, it appeared to the witness that Wolfrath had been admitted to the hospital at 1:20 a. m.

and had been given 10 milligrams of morphine sulfate at 1:35 a. m. At about 3:30 a. m., Dr. Felton said, a saline solution and a dosage of penicillin and streptomycin were apparently administered in anticipation of Wolfrath's impending operation. And at 4:00 a. m., there was an order for the administration of 75 milligrams of demerol and 200 milligrams of sodium luminal. Although Dr. Felton first opined that both the demerol and the sodium luminal had been administered as ordered, he conceded on cross-examination that the notation confirming the sodium luminal was ambiguous, but that "it seems that it was [administered]". (JA at 32).

The exact time of Wolfrath's surgery was never recorded, but Dr. Felton testified that it probably occurred shortly after 4:00 a. m., about one hour before Spano arrived to question Wolfrath about the true circumstances of his bullet wound.

With respect to the effect of the drugs, Dr. Felton, having consulted a medical text book dealing with the effects of drugs, told the court that morphine, demerol, and sodium luminal all generally tend to cause "decreased cerebration". Furthermore, Dr. Felton noted that Wolfrath had told the hospital authorities that he had had some alcohol at about 10:30 on the evening before he checked into the hospital, although the exact quantity was unknown. Alcohol generally had the same effect as the other drugs, said the expert. Although Dr. Felton indicated that the peak effect of the morphine, which was administered at 1:35 a. m., would have occurred between 40 and 90 minutes after it was administered, its total effect would not generally abate until some 4 hours after it was administered.

Responding to further questioning, Dr. Felton then testified to his conclusion that at 5:00 a. m., at the time when Spano spoke with Wolfrath, assuming that all of the drugs were administered, they would have had a combined "synergistic effect" which, as paraphrased in Judge Duffy's opinion,

"would create a 'fugue-like state' in the mind of the patient and would induce a euphoric feeling of invulnerability. . .

[A] person in such a state is not capable of making a serious decision." (Opinion of Judge Duffy [dated July 27, 1977] after the second hearing JA at 8).

Judge Duffy fully accepted Dr. Felton's testimony as dispositive of the claim, and held that Wolfrath's statements to Detective Spano had been involuntary.

We reverse the order granting the Writ. We hold that petitioner has not sustained the burden imposed on a state habeas applicant to prove his constitutional claim. 28 U.S.C. § 2254(d).

## III. VOLUNTARINESS

The burden of proving a constitutional claim on federal habeas corpus review lies with the petitioner. *See Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976); *LePage v. Picard*, 495 F.2d 26, 26–27 (1st Cir.) *cert. denied*, 419 U.S. 879, 95 S.Ct. 144, 42 L.Ed.2d 119 (1974). The mere assertion that a statement may have been made while the speaker was under the influence of drugs is not sufficient to satisfy the burden of proving involuntariness, for voluntariness is not to be judged solely by reference to the speaker's state of mind, to the exclusion of other relevant factors. Rather, the Supreme Court noted in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973),

"[i]n determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. . . .

The significant fact about all of [the Court's] decisions [on voluntariness] is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. . . .
While the state of the accused's mind [and other circumstances] were certainly factors to be evaluated in assessing the 'voluntariness' of an accused's responses, they were not in and of themselves determinative." *Id.* at 226–27, 93 S.Ct. at 2047.

*See also Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *Jennings v. Casscles*, 568 F.2d 229, 232 (2d Cir. 1977).

■ Nor do we think that a case involving a claim of incapacity by virtue of any prescribed quantity of drugs, assuming that they were in fact administered, may be decided solely by reference to the general properties of those drugs. Indeed, courts which have struggled with claims of a defendant's alleged incompetency to stand trial by reason of narcotic addiction and the like have required clear proof of the effect on the individual defendant of the drugs claimed to have incapacitated the defendant. As the court noted in *Hansford v. United States*, 124 U.S.App.D.C. 387, 390, 365 F.2d 920, 923 (1966),

> "The effects of narcotic use will vary depending on the amount of drugs taken, the degree of tolerance developed by the individual, and the idiosyncratic reaction of the person to the drugs."

We do not read *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), on which Judge Duffy relied, as indicating anything to the contrary in cases where the alleged incapacity is raised with reference to a confession. Indeed, in *Jackson*, it was undisputed that drugs had, in fact, been administered to the petitioner prior to his having confessed in response to interrogation. The *Jackson* Court refused to give that fact controlling weight, instead remanding the case since the state's evidence showed only "ready and coherent responses to brief questioning by the police unaffected by drugs or threats or coercive behavior on the part of the police". *Id.* at 392 n.20, 84 S.Ct. at 1789.

Similarly, in the case at bar, the record before Judge Duffy was replete with the testimony of the officers who had observed Wolfrath at the time he chose to speak to Officer Spano when confronted with his "partner", Robert Wyatt. The witnesses who were present at the time observed only that Wolfrath had appeared coherent and alert, as in the *Jackson* case. Moreover, at the federal hearing itself, Wolfrath's own testimony indicates that he had not, at the time of the St. Vincent's confession, been so "out of contact" with his surroundings that he failed to appreciate the circumstances there confronting him. Far from suggesting that his confession was motivated by any "forces" beyond his control, Wolfrath indicated that, at the time, he was fully aware that his partner had been caught, and that his confession was made with the motive of implicating the partner in his criminal activities—which was the same justification that he had made when confessing at Bellevue Hospital the day after the operation.

Thus, except for Dr. Felton's testimony, the evidence before the district court was uncontradicted that, to all outward appearances, Wolfrath confessed of his own will, and for a motive quite consistent with a voluntary choice to implicate Wyatt. *See Coney v. Wyrick*, 532 F.2d 94 (8th Cir. 1976), in which the court upheld the use of an allegedly involuntary confession made by a retarded boy, concluding that " '[t]he inward consciousness of having committed [a crime] . . . and of being confronted with evidence of guilt which [the defendant] could not deny nor explain seems enough to account for the confession here'." *Id.* at 98, *quoting Stein v. New York*, 346 U.S. 156, 185, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953).

Given the evidence in this case, we think that Judge Duffy placed too much reliance on the testimony of Dr. Felton in reaching his conclusion to grant the Writ. Dr. Felton's testimony suffered from a lack of personal knowledge not shared by the witnesses at the state hearing ten years ago. Insofar as it related to the actual effect of the medication on Wolfrath, it was pure conjecture. The doctor testified only to generalizations about the *probable* effect of drugs (which were only *probably* administered) on a text book patient under text book circumstances. Conjecture is simply an inadequate substitute for hard proof in matters of this sort, especially in the delicate area of state-prisoner habeas corpus review; it is simply not the confession of an hypothetical patient that is at stake.

The voluntariness of the confession must be judged under the totality of the circumstances. In determining that Wolfrath did not show that his will was overborne, we are particularly struck with the fact that, unlike most confession cases brought before the courts, the present case, in our view, involves no question of impermissible police tactics. It was not illegal for the police to have conducted a routine inquiry of a person who alleged that he had been the victim of a crime. Thus, Officer Spano's presence at St. Vincent's was fully warranted. That Wolfrath put himself into a position of requiring medical aid; that the fortuitous circumstances caused the police to learn that Wolfrath had lied about being the victim of a crime; that they then had reason to question him again and that they did so, after giving *Miranda* warnings—all of these circumstances do not add up to unconstitutional coercion. The absence of coercive behavior on the part of the police is significant, for what we are left with in this case is a volunteered statement[6] given to a police officer who was not aware of, and so could not have been attempting to elicit information of, the crime to which Wolfrath confessed.

Because the statement was volunteered, because there was no element of improper police tactics, because the evidence was uncontradicted that Wolfrath's condition, though perhaps weakened by his ordeal, was nonetheless strong and that he was alert and responsive, we hold that Wolfrath failed to substantiate his claim that the admission into evidence of his St. Vincent's confession denied him due process of law.

In sum, ten years after the facts out of which his claim arose, and solely on the testimony of a doctor who had neither seen nor heard of the petitioner at the time in question, Wolfrath has attempted to overturn the state judicial processes by challenging their fairness as to him.

We hold that Wolfrath has failed to show that he is entitled to relief; he was not denied due process of law.

Therefore, we reverse.

---

6. We note that Judge Duffy misstated the facts in his opinion, erroneously averring that the confession to Spano was made "in response to questioning". It was not, as is shown by the uncontradicted evidence, including Wolfrath's own recollections at the habeas hearing. Indeed, since the statement which was litigated below was a gratuitously volunteered statement, *Miranda* itself is inapplicable, for spontaneous statements which are not the result of "official interrogation" have never been subject to its strictures. *Mi-* *randa v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Messina,* 507 F.2d 73 (2d Cir. 1974), *cert. denied,* 420 U.S. 993, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975); *United States v. Gaynor,* 472 F.2d 899 (2d Cir. 1973); *United States v. Maxwell,* 383 F.2d 437, 443 (2d Cir. 1967), *cert. denied,* 389 U.S. 1057, 88 S.Ct. 809, 19 L.Ed.2d 856 (1968). Thus, we are concerned only with the question whether the admission into evidence of Wolfrath's confession deprived him of due process of law.